151 F.3d 50
 78 Fair Empl.Prac.Cas. (BNA) 661,
74 Empl. Prac. Dec. P 45,583
Paul M. DANZER, Plaintiff-Appellant,
v.
NORDEN SYSTEMS, INC., Westinghouse Norden Systems, Inc.,
United Technologies Corporation, and Northrop
Grumman Corporation, Defendants-Appellees.
 No. 97-9086.
 United States Court of Appeals,
Second Circuit
 Argued May 27, 1998.
Decided July 15, 1998.
 
 James L. Kestell, Kestell & Associates, Falls Church, VA, for petitioner-appellant.
 Lynn A. Kappelman, Day, Berry & Howard, Stamford, CT (Natasha M. Lipcan, of counsel), for defendants-appellees.
 Before: CALABRESI, Circuit Judge, POLLACK* and DRONEY,** District Judges.***
 CALABRESI, Circuit Judge:
 
 
 1
 Paul Danzer appeals from the granting of his former employer's motion for summary judgment by the United States District Court for the District of Connecticut (Alan H. Nevas, Judge ). Finding that a rational finder of fact could have rendered a verdict for Danzer, we reverse that judgment and remand for trial.
 
 FACTS
 
 2
 The facts of this case, viewed (as they must be) in the light most favorable to Danzer, are as follows. For twenty-seven years, Danzer worked as an engineer at Norden Systems, Inc., where he consistently received exemplary performance evaluations and, occasionally, specific bonus payments for outstanding service. Over the years, Danzer progressed to levels of seniority. For example, in 1988, he served as the Acting Engineering Manager for Systems Engineering.
 
 
 3
 In 1990, Dan Held, Danzer's supervisor, instructed Danzer to prepare a chart indicating the ages of the engineering staff, to corroborate a suspicion Held had that the average age of the engineers was well into the 40s and 50s. (It apparently was.)
 
 
 4
 In January 1992, Held assembled senior members of his staff (including Danzer), and explained that one of the goals for the upcoming year was to get some younger people on board (to raise the IQ of the staff). He also stated that the current staff were, in his opinion, a bunch of "alta[sic] cockers." Held asked Lester Kosowsky, one of the staff members at the meeting, to translate this Yiddish term. Kosowsky replied, "Dan, you don't really mean that." But Held insisted on a translation, which Kosowsky rendered as "old fogies."
 
 
 5
 After this meeting, a co-worker of Danzer's, Marshall Greenspan, complained to Salina Gary, head of Norden's EEO Office. Gary investigated--she spoke to Danzer and others--and ordered Held to attend a diversity training program. The next month, however, Held reiterated that Norden needed a new cast of characters to win new business, and that "[w]e need new blood--new and younger, fresh skills from out of schools." Following this meeting (which Greenspan did not attend), Danzer himself complained to Gary and, in March, to Jane Nelson, Norden's Manager of Employee Relations.
 
 
 6
 Shortly thereafter--according to the evidence submitted in opposition to the motion for summary judgment--Danzer began encountering difficulty in getting authorization to fund various proposals and projects. And in the summer, when Danzer's annual performance review for 1991 was prepared, Held, while giving Danzer his consistently above-average rankings, marked Danzer lower in "leadership," lamenting that Danzer was "technically creative, but has not brought any significant new business in yet, nor developed an aggressive initiative to get new business--unfortunately, this was (and still is) his charter, at least for the lat[t]er part of 1991."
 
 
 7
 Danzer claims that matters worsened as 1992 progressed. Not only was he denied funding to develop proposals--which Danzer says was critical if he was to secure any new business for Norden--but he began to be removed from projects that he was already on, including, for example, one in which he was a key engineer (and, indeed, for which he had earlier received a special commendation in his performance evaluation for 1992).
 
 
 8
 At the beginning of 1993, Held arranged for an "interim" evaluation of Danzer to be made. This was prepared by an employee who admitted that he had never been asked to do such an interim evaluation before and that Held had specifically asked him to prepare Danzer's. In this evaluation Danzer was graded very poorly; among other things, he was ranked as "needing development" in five areas, including leadership. To the rankings, Held added the comment that, while Danzer had met many of his goals (approved by Held) for 1992, these goals were "not particularly challenging for a senior Grade Level 51 engineer."
 
 
 9
 In response to this evaluation, Danzer prepared an "objection" and submitted a "rebuttal" to Nelson in April of 1993. But when he expressed concern about the poor evaluation to Held, he was told not to worry about it because he was not going to be around much longer. Danzer then retained counsel, who, in a letter to Norden, expressed concern over Held's comment.
 
 
 10
 Danzer's position was eliminated in May (effective June 30), of 1993. And Danzer began the current litigation in the United States District Court for the District of Connecticut under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.
 
 
 11
 Norden moved for summary judgment. It argued, among other things, that there was an overwhelming restructuring of the defense contracting industry in the early to mid 1990s and that Danzer was let go (along with 80% of the workforce) because he simply could not generate the new business that Norden so desperately needed in order to survive. It also argued that Held's derogatory remarks should not have been given much weight, because (i) Held was not the officer who ultimately terminated Danzer; (ii) Held himself was "old" when he made the "alt[e] cocker" comment (as were the other members of the meeting); and (iii) the two meetings at which Held made troubling comments took place over a year before Danzer was actually fired. The district court granted Norden's motion, and Danzer appeals.
 
 DISCUSSION
 
 12
 We conclude that the district court erred. The record before it was replete with evidence from which a rational finder of fact could infer that age was a motivating factor in Danzer's dismissal, under either the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny, or the mixed-motive framework of Price Waterhouse v. Hopkins, 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). See generally Renz v. Grey Advert., Inc., 135 F.3d 217, 221-23 (2d Cir.1997) (clarifying the burdens of production and persuasion in such cases); Stratton v. Department for the Aging, 132 F.3d 869, 878-79 (2d Cir.1997) (discussing the two paradigms and emphasizing that, in determining whether a jury verdict may be sustained, the nonmovant gets "the benefit of all reasonable inferences").
 
 
 13
 As recent discrimination cases of our court have made clear, summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial. See, e.g., Stern v. Trustees of Columbia Univ., 131 F.3d 305, 312 (2d Cir.1997).[1] There must either be a lack of evidence in support of the plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.1998), or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error. See Fisher v. Vassar College, 114 F.3d 1332, 1359 (2d Cir.1997) (in banc ) (Calabresi, J., concurring in part and dissenting in part). And it remains the case that at summary judgment, all factual inferences must be resolved in favor of the non-movant. Thus, for example, the district court's conclusion that "the 'alt[e] cockers' remark is ambiguous and susceptible to several nondiscriminatory interpretations," while quite possibly correct, does no more than identify a disputed factual issue as to which the nonmovant's (plausible) interpretation must, at summary judgment, be accepted.
 
 
 14
 Defendants advance various arguments--some fact-specific and some purely legal--in favor of summary judgment; none of them have merit. But before we reach these contentions, we address several arguments powerfully put forward by the dissent.
 
 I.
 
 15
 The dissent maintains that the plaintiff did not directly traverse the defendants' stated reasons for firing him and that, without such evidence, the defendants' proffered reasons negate the plaintiff's prima facie case and require summary judgment against him. But in so arguing, the dissent conflates two different age-neutral explanations that Norden asserted to justify Danzer's termination.
 
 
 16
 First, Norden contended that Danzer job performance had deteriorated and had become unacceptable because he was not bringing new business to the company. Danzer directly countered this explanation in two ways. In his affidavit, he specifically denied that his actual performance had declined, maintaining that he performed at an "above-average" level until the time he was fired. And he adduces evidence, also in his affidavit, that, to the extent that he had failed to attract new business for Norden, Norden had created this poor performance by denying Danzer the funding that was necessary to generate new business. Danzer's claim that his performance had remained acceptable is no more conclusory than Norden's assertion that it had deteriorated. Moreover, his assertion that he lacked adequate funding suffices to create a genuine issue of fact on the one reason that Norden gave for his alleged poor performance, his failure to attract new business. We therefore conclude that Danzer adequately met his burden of producing evidence to rebut Norden's explanation.[2]
 
 
 17
 Norden's second age-neutral explanation for terminating Danzer was that Danzer was "downsized" as part of a reduction in force at Norden. The dissent is correct that Danzer does not dispute that he was let go as part of a reduction in force. But to say that Danzer's admission that his firing took place in the context of a downsizing somehow justifies summary judgment for Norden is in effect to say that there cannot be age discrimination in a case in which the plaintiff's position is eliminated altogether and the plaintiff is not replaced by a younger employee. (This, too, is an argument that the dissent expressly makes, albeit only in passing.) The statute, however, makes no mention of any requirement that a plaintiff must be replaced in order to give rise to a cause of action. And reduction-in-force (RIF) cases are, in fact, common in the federal courts. See, e.g., Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 90-91 (2d Cir.1996) (rejecting expressly the contention that a discharged employee's position would have to remain in existence). This is not surprising, for if, in discrimination cases, the issue can sometimes focus on who took the place of a covered employee, it equally can center on whether the selection of the employees to be fired in a downsizing was influenced by an impermissible ground. An ADEA action can lie in either situation.[3] Accordingly, while the facts that an employee's termination took place in the context of a reduction in force and that the employee was not replaced may well inform the general circumstances and hence may be considered by the jury when it weighs the submitted evidence, they rarely will be determinative at the summary judgment stage.
 
 II.
 
 18
 In favor of affirmance, defendants renew several arguments made to the district court. They are, however, to no avail.
 
 
 19
 First, we address defendants' three theories as to why Held's derogatory remarks should be deemed irrelevant: (i) Held was not the officer who actually fired Danzer; (ii) Held himself was over 40; and (iii) Held's comments were made well over a year before Danzer was terminated and thus are too distant from the date of firing to constitute valid evidence. We reject each of these arguments. A jury could well believe that Held's comments reflected company policy, and hence constituted evidence of discrimination. The proposition that people in a protected category cannot discriminate against their fellow class members is patently untenable. And finally, defendants make too much of the lag in time between Held's comments and Danzer's ultimate termination. Plaintiff has adduced evidence that, if believed, tends to show that the remarks were part of a sequence of events culminating in his discharge, and that an element in this sequence was a conspiracy to make him appear "underutilized" that began soon after the offensive comments were made and after he registered a complaint against Held for making them. This evidence, if true, suffices to link the improper comments to Held's firing. Again, one need not believe plaintiff's evidence, but that is for a jury to decide, and not a court at summary judgment.
 
 
 20
 Equally meritless are defendants' other grounds for summary judgment. The fact that there was an overwhelming reduction in Norden's workforce certainly is a factor that the jury may consider when weighing whether to credit Danzer's or Norden's versions of the events. But that fact alone, as we discussed above, cannot provide the ground for summary judgment. Similarly, Norden's claims--that it made a change in Danzer's job assignments, and that this change explains the sudden deterioration in Danzer's evaluations--are disputed by plaintiff. As such, they do not support the defendants' motion for summary judgment. Finally, the alleged fact that Norden tried (and failed) to find a position for Danzer elsewhere in the company before his discharge, even if true, is inapposite.[4]
 
 III.
 
 21
 All the foregoing arguments are marshaled together by the defendants to advance two broader legal propositions that, in their opinion, justify summary judgment. The first is that "stray remarks" alone do not support a discrimination suit. The second is that sudden and unexpected downturns in performance reports cannot, by themselves, provide the basis for a discrimination action. While both these statements, in isolation, are true, see Viola v. Philips Med. Sys., 42 F.3d 712, 718 (2d Cir.1994) (evaluations); Woroski v. Nashua Corp., 31 F.3d 105, 109-10 (2d Cir.1994) (remarks), they do not apply to the facts of this case.
 
 
 22
 Thus, Norden seeks to do away with the "alt[e] cockers" comment altogether by relying on Woroski, 31 F.3d at 109-10, in which we concluded that stray remarks, even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination. But all that Woroski holds is that such comments, without more, cannot get a discrimination suit to a jury. (If it were otherwise, disparaged workers who had the "fortuity" of being in the class encompassed by the stray remark would have an instantaneous jury case on discrimination, regardless of the ground for their dismissal.) When, however (as in the instant appeal), other indicia of discrimination are properly presented, the remarks can no longer be deemed "stray," and the jury has a right to conclude that they bear a more ominous significance.
 
 
 23
 The same reasoning renders defendants' second general contention meritless. Relying on Viola, 42 F.3d at 718, defendants argue that a sudden and unexpected downturn in performance reports cannot buttress a discrimination claim. In Viola, we held that the fact that an employee first received an adverse review on the eve of a reduction in force did not, on its own, suffice to make out a showing of pretext. Such an occurrence, we concluded, could not, on its own, be transformed into the predicate for a discrimination suit. See Shabat v. Blue Cross Blue Shield, 925 F.Supp. 977, 988 (W.D.N.Y.1996) ("To hold otherwise would be to hold that things never change, a proposition clearly without a basis in reality." (internal quotation marks and citation omitted)), aff'd mem., 108 F.3d 1370, 1997 WL 138836 (2d Cir.1997). But Danzer does not, in this case, seek to rely solely on the sudden downturn in his evaluations. And Viola does not preclude a sudden decline in ratings from being evidence that, even if insufficient alone, may nonetheless work with other submitted proofs (such as biased remarks) to support a jury verdict of discrimination.
 
 IV.
 
 24
 Finally, Norden argues that all of the evidence upon which Danzer relies to make out his prima facie case (and to defend against the motion for summary judgment) is only to be found in his extensive affidavit. Defendants characterize this affidavit as "self-serving" and "conclusory," and claim that it is, therefore, insufficient.
 
 
 25
 As an initial matter, we find no evidentiary infirmity in Danzer's detailed affidavit, which chronicles in depth the various episodes giving rise to his suit. More importantly, we resist defendants' invitation to graft additional requirements onto Fed.R.Civ.P. 56(c). There is nothing in the rule to suggest that nonmovants' affidavits alone cannot--as a matter of law--suffice to defend against a motion for summary judgment.[5] Indeed, by suggesting that Danzer's affidavit is insufficient documentary evidence--or nothing more than a de facto extension of his pleadings--defendants seek to pervert both the language of Rule 56(c) and the spirit of employment discrimination jurisprudence.
 
 
 26
 In discrimination cases, the only direct evidence available very often centers on what the defendant allegedly said or did. See generally Developments in the Law--Employment Discrimination, 109 Harv.L.Rev. 1568, 1579-1602 (1996) (discussing the difficulty in obtaining evidence in discrimination cases and the influence that this has had on procedural burdens). Since the defendant will rarely admit to having said or done what is alleged, and since third-party witnesses are by no means always available, the issue frequently becomes one of assessing the credibility of the parties.
 
 
 27
 At summary judgment, however, that issue is necessarily resolved in favor of the nonmovant. To hold, as defendants ask us to do, that the nonmovant's allegations of fact are (because "self-serving") insufficient to fend off summary judgment would be to thrust the courts--at an inappropriate stage--into an adjudication of the merits. Such a radical change in the courts' role would be inappropriate not just in the discrimination context, but everywhere. See, e.g., Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 38 (2d Cir.1994) ("It is not the province of the summary judgment court itself to decide what inferences should be drawn."). We therefore reject defendants' invitation to create this new rule.[6]
 
 
 28
 * * *
 
 
 29
 Plaintiff in this case has introduced evidence that (i) begins with defendants' request for an age chart of its employees; (ii) proceeds to defendants' direct statements of an age-discriminatory sort; (iii) adds to these a sudden change in evaluation ratings; (iv) indicates that this change occurred following the making of the offensive comments (and complaints by employees--including the plaintiff--with respect to the remarks); and (v) culminates in the firing of the plaintiff who, is in the protected class. Each of these pieces of evidence, by itself, might arguably be insufficient to permit an age discrimination suit to survive summary judgment. Taken altogether as true--as they must be at summary judgment--they are more than enough to support a jury verdict that plaintiff was picked to be "downsized" in part because of his age.
 
 
 30
 Accordingly, the judgment of the district court is REVERSED, and the matter is REMANDED for trial.
 
 POLLACK, District Judge, dissenting:
 
 31
 I respectfully dissent.
 
 
 32
 To afford the plaintiff, because of his age, with consideration under the ADEA, in the face of his undisputed ineffective performance of his assigned tasks, would also lead to the possible exchange, at the option of a jury, of his at-will employment status for a tenured employment without a contract therefor.
 
 
 33
 The employer presented a legal reason for the discharge--the undisputed performance of the assigned employment. As stated in the majority opinion, the employer's reason, among other things, was "that there was an overwhelming restructuring of the defense contracting industry in the early to mid 1990's and that Danzer was let go (along with 80% of the work force) because he simply could not generate the new business that Norden so desperately needed in order to survive." Danzer's position was eliminated in May, 1993 (effective June 30, 1993). Arguably, the ineffective performance was correlated with Danzer's age.
 
 
 34
 Hazen Paper v. Biggins, 507 U.S. 604, 609, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993), teaches that even if the reason for a discharge happens to correlate with age, the employee's age does not ground a claim for legally disparate treatment under the ADEA. Moreover, where, as in this case, an employment decision is motivated by unrefuted economic concerns, a claim does not lie under the ADEA in favor of the employee. Criley v. Delta Air Lines Inc., 119 F.3d 102, 105 (2d Cir.1997).
 
 
 35
 Dissatisfaction of the employer with the admitted inadequate performance of the employee's assigned tasks is not grounds for invoking the ADEA, especially where the position has been eliminated for undisputed economic reasons and the position was not to be filled by a replacement, younger or older.
 
 
 36
 When, as shown here, the employer has met its burden of producing an age-neutral reason for the discharge, the presumption of discrimination raised by a prima facie case "drops out of the picture." Norton v. Sam's Club, 145 F.3d 114, 117-18 (2d Cir.1998) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). Neither the Court, nor a jury, sits as a "super-personnel department" to reexamine an entity's decisions on the usefulness to the enterprise of an at-will employee. Stern v. Trustees of Columbia Univ. 131 F.3d 305, 315 (2d Cir.1997) (quoting Dale v. Chicago Tribune Co., 797 F.2d 458, 464 (7th Cir .1986), cert. denied, 479 U.S. 1066, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987)).
 
 
 37
 As the district court judge so carefully and analytically pointed out and as noted hereafter, the conjectural and problematic excuses proffered by the employee concerning the level of his recent performance does not satisfy the McDonnell Douglas burden shifting analysis to defeat defendant's motion for summary judgment. The evidence submitted simply does not create a genuine issue for trial.
 
 
 38
 In its sympathetic assessment of the disconnected, isolated and remote straws woven together by plaintiff in a hapless attempt to meet his burden of answering for his recent nonproductive performance (inadequate in the estimation of the employer), the majority opinion fails to embrace the business quandary of an employer such as Norden. A causal relationship between the wisps of alleged insensitive behavior and the adverse employment decision is starkly lacking, even in light of past satisfactory performance. Overlooking present business conditions for the brighter conditions of the past does not take into account drastic business changes and the present productivity needs of the company.
 
 
 39
 Plaintiff's replacement was not sought, nor was he replaced. As mentioned in its footnote 4, the majority acknowledges that "Norden's position is that its supposed attempt to relocate Danzer--rather than fire him--shows that it was trying its best to help him out in an era of corporate downsizing." Plaintiff, a systems engineer who had served the company faithfully and well, over many years, and had aged in the job, needed to stay current with changing technology. He was specifically charged with, and had assumed the assigned function of, developing new ideas and obtaining essential new business for the company.
 
 
 40
 In 1989, Norden lost two of its major contracts which constituted half of its business base, causing further downsizing of its personnel. A new supervisor was reassigned to seek and obtain government contracts and plaintiff was reassigned to the new group. Later, with a transfer of a Shipboard Radar Business Unit to plaintiff's location, plaintiff was put in charge of the unit and became the "new business" manager of the unit. The most important part of his employment was planning and development of new business, obtaining funding for research and marketing ideas for the Navy, or actually responding to a project request by the Navy.
 
 
 41
 New business was a product of conception and promotion, as well as utilization of the latest technology. The director of Research and Development at Norden exhorted the engineering staff to attend training sessions concerning the latest technology in the industry and, plainly as a spur to their incentive, told the engineers at Norden seventeen months before the instant discharge that they were all a bunch of "alta cockers" (old fogeys)--including himself--in ideas, and in attracting new business. Nearly a year and half later, plaintiff, in charge of the search for new business for the company, was laid off because he had repeatedly failed to develop any needed new ideas and business for the Shipboard Radar program. At the time, plaintiff was part of the senior technical staff and enjoyed a handsome remuneration.
 
 
 42
 In his deposition, plaintiff acknowledged that his assignment over the years and just before his termination was to define novel engineering topics and find new business. He admitted that the bulk of his time was spent on new business development. He did not dispute his failure.
 
 
 43
 No evidence in the record indicated any old-age animus whatever on the part of the company and there was no intent to replace plaintiff with anyone younger or older. No basis was presented in the evidence on which reasonable minds could differ over whether age discrimination--as distinct from a failure to update his performance and results--formed any part of the termination of plaintiff's employment. It all centered on not having "brought in any significant business" and failing to develop "an aggressive initiative to get new business" despite the fact that this was his charter.
 
 
 44
 The majority opinion merely reiterates plaintiff's prima facie case and declares that such evidence is sufficient to withstand summary judgment. The majority seemingly sets aside the fact that Norden offered ample unrefuted evidence of a legitimate, nondiscriminatory reason for Danzer's discharge--namely, that Danzer's performance in creating and attracting new business was deficient. Under the McDonnell Douglas burden shifting analysis, to defeat Norden's motion for summary judgment, Danzer was required, in response to the motion, to produce evidence sufficient to support a rational finding that the legitimate, nondiscriminatory reasons proffered by Norden for his discharge were pretextual and that Danzer's age was more likely than not the real reason for his discharge. Woroski v. Nashua Corp., 31 F.3d 105, 108-09 (2d Cir.1994). Nowhere in the majority opinion is there any mention of the fact that Danzer had made no response to Norden's economic evidence or the adequacy of Danzer's conjectural claims of a premeditated, orchestrated plot to set him up for failure. Those contentions, without more, are specious at best. See Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir.1989) (a nonmovant does not meet its burden of setting forth facts showing the existence of a genuine issue for trial by submitting conjectural or problematic evidence).
 
 As stated by the district judge:
 
 45
 Plaintiff offers no evidence that he brought in new business, developed an aggressive initiative to get new business or properly adapted to the new business environment. Rather, he merely asserts that until the time of his termination, he performed his job at the same above-average performance level but that Held denied him the funding to work on proposals and projects, intentionally left him off assignments to make it appear that he was underemployed, and gave him poor performance reviews to cover up the unlawful age discrimination. This conjectural evidence is not sufficient to create genuine fatal dispute as to whether the defendant's reasons were false.
 
 
 46
 A review of the record plainly supports Judge Nevas' decision. Danzer's rebuttal evidence consisted almost exclusively of speculative statements contained in his own affidavit that he would have performed better had he been given funding for projects from Held. However, he does not answer Held's description of how business was conducted at Norden. In his deposition, Held indicated without contradiction that obtaining approvals for funding was a process involving several people and required a pro-active approach for funding:
 
 
 47
 Q. Well, would he go on his own or would he always have to clear it through you?
 
 
 48
 A. No. No. My--the senior guys on my staff basically were empowered to try and form a consortium within the company and go out and get new business. And as such, they would get some IR & D pieces, some engineering support to management pieces and some bid proposals pieces. To do that you had to approach many people.
 
 
 49
 Q. So you expected your senior people to get the approval for this various funding on their own?
 
 
 50
 A. Oh, yeah.
 
 
 51
 Q. Is that true of engineering support and marketing also?
 
 
 52
 A. They had to get it from marketing. I could help advocate for them. They had to be internal entrepreneurs and convince a number of customers within the company, of which I was one, to support their efforts to either do research or go out and market or actually respond to a written proposal.
 
 
 53
 The District Court fairly and reasonably concluded that no rational fact finder could conclude from the evidence submitted by Danzer that the defendants' proffered reasons for discharging him (1) were false or unworthy of belief and (2) that, more likely than not, Danzer's age was the real reason for his discharge. See, e.g., DeMarco v. Holy Cross High Sch., 4 F.3d 166, 170 (2d Cir.1993).
 
 
 54
 Accordingly, I would affirm.
 
 
 
 *
 The Honorable Milton Pollack, District Judge of the United States District Court for the Southern District of New York, sitting by designation
 
 
 **
 The Honorable Christopher F. Droney, District Judge of the United States District Court for the District of Connecticut, sitting by designation
 
 
 ***
 Pursuant to 28 U.S.C. § 46(b) and an order of the chief judge of this Court certifying a judicial emergency, this case was heard by an emergency panel consisting of one judge from this court and two judges of the United States District Court sitting by designation
 
 
 [1]
 The author of this opinion dissented in Stern, see Stern, 131 F.3d at 314-20 (Calabresi, J., dissenting), not with respect to the legal proposition for which it is cited above, but because he disagreed with the application of that principle to the facts of the case. In Stern, judgment as a matter of law against the plaintiff was reversed. We believe that plaintiff's evidence in this case is at least as strong as the evidence adduced by the plaintiff in Stern
 
 
 [2]
 The dissent correctly notes, quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), that once the employer produces an age-neutral reason for the plaintiff's termination, the presumption of discrimination "drops out of the picture" and the burden shifts to the plaintiff to rebut the employer's proffered reason. But this does not mean that the evidence that the plaintiff used to establish his prima facie case is wiped out; there is no reason that the plaintiff cannot rely on evidence offered to establish his prima facie case--in this case, Danzer's affidavit--subsequently to rebut the employer's age-neutral explanation
 
 
 [3]
 For a cogent discussion of the interaction between RIF cases and the burden of proof in employment discrimination litigation, see (now) Chief Judge Winter's opinion in Burger v. New York Institute of Technology, 94 F.3d 830, 832-34 (2d Cir.1996)
 
 
 [4]
 Norden's position is that its supposed attempt to relocate Danzer--rather than fire him--shows that it was trying its best to help him out in an era of corporate downsizing. But even if this were so, it only shows that Norden was being solicitous--which is not logically related to whether it was also being discriminatory. The kindness or vindictiveness of an employer-defendant does not provide an independent basis for (or the exoneration from) an employment discrimination action. As a result, collateral commendable behavior by an employer cannot serve as an absolute shield from an ADEA suit
 
 
 [5]
 Of course, if the nonmovant's affidavit fails to comply with Federal Rule of Civil Procedure 56(e), in that it is conclusory or not based on the affiant's personal knowledge, the affidavit would be insufficient to defend against a motion for summary judgment. Cf. Attorney General v. Irish Northern Aid Comm., 668 F.2d 159, 162 (2d Cir.1982) (holding that a "conclusory affidavit" filed by an affiant with an admitted lack of personal knowledge was insufficient to create a genuine issue of material fact such that would defeat a motion for summary judgment)
 
 
 [6]
 We note that defendants' attempt to stigmatize plaintiff's affidavit as "self-serving" conveniently also reduces one of the more damning pieces of evidence--the age chart--to a mere instrument of self-service. Because the chart no longer exists and it is unlikely that Held will independently mention it, the chart can only be sworn to in Danzer's affidavit. But at argument, Norden did not deny that Held had asked Danzer to make the chart. To assert that this piece of evidence is effectively not cognizable because it appears only in plaintiff's allegedly "self-serving" affidavit is, to put it mildly, disingenuous