18-1020
*Dotson v. City of Syracuse, et al.*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

### SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 27th day of February, two thousand and nineteen.

Present:
>    GUIDO CALABRESI,
>    JOSÉ A. CABRANES,
>    RICHARD C. WESLEY,
>        *Circuit Judges*.

———————————————

SONIA DOTSON,

                    *Plaintiff-Appellant*,

            v.                                          18-1020

CITY OF SYRACUSE, GARY MIGUEL, in his individual capacity as former Chief of Police of the City of Syracuse, MICHAEL HEENAN, in his individual capacity as former First Deputy Chief of Police of the City of Syracuse, DAVID

BARRETTE, in his individual and official capacity as First Deputy Chief of Police of the City of Syracuse, JUDY CULETON, in her individual and official capacity as the Commanding Officer of the Human Resources Division of the City of Syracuse Police Department, JOSEPH SWEENY, in his individual and official capacity as a Captain with the City of Syracuse Police Department, NICHOLAS KLEIST, JR., in his individual and official capacity as a Lieutenant with the City of Syracuse Police Department, JOHN DOE(S), and/or JANE DOE(S), in their individual and official capacities, RICHARD TRUDELL, in his individual and official capacity as a Captain with the City of Syracuse Police Department,

*Defendants-Appellees*.

| For Plaintiff-Appellant: | A.J. BOSMAN, Bosman Law Firm, L.L.C., Rome, NY. |
|---|---|
| For Defendants-Appellees: | KRISTEN E. SMITH, Corporation Counsel, City of Syracuse, Syracuse, NY (Mary L. D'Agostino, Assistant Corporation Counsel, *on the brief*). |

Appeal from the United States District Court for the Northern District of New York (Mordue, *J.*)

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment is **REVERSED** and the matter is **REMANDED FOR TRIAL**.

Plaintiff-Appellant Sonia Dotson appeals from the district court's grant of summary judgment to the City of Syracuse and members of its police department

2

(collectively, "Defendants") on Dotson's claim of sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2, and related provisions of state and federal law.

We assume the parties' familiarity with the matter but briefly review the facts as relevant to our decision. In 2008, Dotson, a Community Service Officer ("CSO") for the Syracuse Police Department ("SPD"), approached her direct supervisor, Sergeant Naylor,[1] to discuss the ongoing parking shortage around the Syracuse Public Safety Building. When Naylor asked to end the conversation, Dotson pressed the issue and informed Naylor she would have to arrive late and leave early to compensate for the longer walk to her vehicle. Sergeant Kleist, sitting nearby, intervened and asked that Dotson return to her desk. When Dotson persisted, explaining that she was speaking with Naylor rather than Kleist, Kleist again asked that she return to her desk. Dotson complied. Though some details of the interaction, such as whether Dotson and/or Kleist raised their voices, are disputed, all parties agree that the interaction lasted less than five minutes.

Kleist, Naylor, Dotson, and two police officers who observed the interaction subsequently wrote interdepartmental memos describing the incident. Kleist then discussed the incident with his supervisor, Lieutenant Sweeny, and the two agreed that Kleist would prepare a disciplinary report charging Dotson with insubordination. After

---

[1] Sergeant Naylor is not a defendant in this action. All other police officers involved in the incident are named defendants.

reviewing the report, Sweeny recommended that Dotson's employment be terminated. Bureau Chief Barrette, First Deputy Chief Heenan, and Chief of Police Miguel later reviewed the interdepartmental memos and agreed with the charge of insubordination; however, they reduced the punishment to five days' suspension without pay. A year and a half later, an independent arbitrator overturned the suspension and ordered that the SPD reimburse Dotson for lost pay.

Our review, like the district court's, is limited to the issue whether Dotson put forward sufficient evidence that her five-day suspension was motivated in part by sex discrimination. *See Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 76 (2d Cir. 2016). "We review a district court's grant of summary judgment *de novo*, construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor." *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005). "This Court has long recognized the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent." *Walsh*, 828 F.3d at 74 (quotation marks and citation omitted).

Courts analyze claims of disparate treatment on the basis of sex under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff must establish a *prima facie* case by demonstrating that: "(1) she is a member of a protected class; (2) her job performance was satisfactory; (3) she suffered adverse employment action; and (4) the action occurred under conditions giving rise to

4

an inference of discrimination." *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006) (citing *McDonnell Douglas*, 411 U.S. at 802). Second, if the plaintiff makes a *prima facie* case, the burden shifts to the defendant employer "to provide a legitimate, non-discriminatory reason for the action." *Id*. Third, if the employer makes such a showing, the burden shifts back to the plaintiff to prove discrimination. *Id.* As we have explained, "[a]n employee may satisfy this ultimate burden either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985) (quotation marks and citation omitted). A plaintiff need not prove that the employer's explanation is false to prevail; "plaintiff sustains his burden if he proves that an adverse employment decision was motivated by discrimination, regardless of whether he is able to additionally show that the employer's asserted justification for the decision was 'pretextual.'" *Henry v. Wyeth Pharmaceuticals, Inc.*, 616 F.3d 134, 156 n. 5 (2d Cir. 2010). "A plaintiff's evidence at the third step of the *McDonnell Douglas* analysis must be viewed as a whole rather than in a piecemeal fashion." *Walsh*, 828 F.3d at 76.

Unlike in Title VII retaliation claims, "[a]n employee who alleges status-based discrimination under Title VII need not show that the causal link between injury and wrong is so close that the injury would not have occurred but for the act." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013). "So-called but-for causation is not the

5

test. It suffices instead to show that the motive to discriminate was *one of the employer's motives*, even if the employer also had other, lawful motives that were causative in the employer's decision." *Id.* (emphasis added).

This appeal asks whether the district court erroneously found that Dotson failed to meet her burden under *McDonnell Douglas*'s third step. We hold on three grounds that it did.

*First*, the Defendants' disparate treatment of similarly situated employees suggests that the decision to label Dotson's behavior as "insubordinate" was motivated, at least in part, by discriminatory intent on the part of Kleist and Sweeny. "When considering whether a plaintiff has raised an inference of discrimination by showing that she was subjected to disparate treatment, . . . the plaintiff must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (quotation marks and citation omitted). Whether two employees are "similarly situated in all material respects" is determined "based on (1) whether they were subject to the same workplace standards and (2) whether the conduct for which [they were] discipline[d] was of comparable seriousness." *Id.* at 40. "Whether two employees are similarly situated *ordinarily presents a question of fact for the jury*." *Id.* at 39 (emphasis added).

6

In January 2010, a male police officer, "PO 1," was punished for violating the SPD's "Courtesy" rule after he "*disobey*[*ed*] *a direct order*."[2] Dotson App. 183, 186 (emphasis added). According to an interdepartmental memo, PO 1 complained to Sweeny about a colleague making personal calls and listening to loud music during the workday. Although Sweeny directed PO 1 not to address the matter himself, PO 1 disobeyed the order by "verbally confront[ing]" the colleague with "a loud, rude and aggressive tone to his voice." *Id.* at 183. Sweeny recommended, and PO 1 received, a written reprimand and loss of one furlough day—far less than the termination Sweeny recommended for Dotson.

The district court concluded that the punishment PO 1 received was less severe because his violation was less severe.[3] But the different labels given to the two infractions—insubordination versus discourteousness—obscure their similar underlying

---

[2] The SPD Rules of Conduct section 1.16(B)(1)(b) requires that "[e]mployees . . . not use harsh, profane, insolent, or intentionally insulting language." Syracuse App. 210.

[3] The court also noted that

> in his Inter-Office Memo regarding the incident, defendant Sweeny commented that [PO 1] had disobeyed a direct order by speaking with [the colleague]. However, the court finds that a reasonable jury could not conclude that this behavior was comparable to the behavior that led to [Dotson's] . . . suspension[] where she spoke to supervisory officials in a rude and confrontational way.

Dotson App. 378. The court thereby impermissibly drew inferences against Dotson, who alleges that she neither used profanity nor yelled during her interaction with Naylor and Kleist. These factual allegations leave an open question as to whether she was sufficiently "rude and confrontational" to render her behavior incomparable to that of PO 1.

facts. In both instances Sweeny issued a directive to a subordinate,[4] and in both instances the subordinate allegedly failed to follow that directive. A reasonable juror could conclude that Dotson and PO 1 engaged in similar behavior and that Sweeny treated PO 1's infraction as less serious than Dotson's.

The Defendants further argue that CSOs such as Dotson are not similarly situated to police officers such as PO 1 because the two groups are not subject to the same workplace standards. While it is true that different labor agreements govern CSOs and police officers, both groups are governed by the Rules of Conduct – Professional Standards of Conduct & Ethics. It was under those Rules of Conduct that both Dotson and PO 1 were disciplined. And while the SPD's Human Resources Division is generally responsible for disciplining CSOs, whereas the Internal Affairs Division disciplines police officers, neither division spearheaded the disciplinary actions at issue here. Instead it was Sweeny who selected the different subsections of the Rules of Conduct under which Dotson and PO 1 were disciplined.[5] This evidence creates a triable issue of fact as to whether Dotson's discipline, which stemmed from an unusually (and suspiciously) harsh recommendation by Sweeny, was motivated in part by discrimination against women.

---

[4] *Cf. Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997) (holding that alleged comparators were not similarly situated in part because they had different supervisors).

[5] Moreover, both Dotson's and comparator POs' disciplinary reports reflect the same procedural approach. A supervising police officer drafts the initial report, and the report is reviewed up the chain of command, ending with the approval of the Chief of Police.

*Second*, the district court erred in concluding that the severity of Dotson's discipline did not provide evidence of discrimination. Heenan testified that "[o]ur policy for insubordination from the time I've been in the Chief's office was a five-day suspension without pay." Dotson App. 352. And yet, Sweeny recommended *terminating* Dotson's employment. Sweeny even testified that he considered his recommendation to be "extreme" (though not "extraordinary") under the circumstances. Dotson App. 345.

Additionally, although Dotson was ultimately suspended the five days without pay that Heenan testified was the SPD's "policy," other male employees received shorter suspensions for arguably similar behavior. For example, another male police officer, "PO 2," lost only three days' furlough for violating the SPD's "Obedience to Orders" rule.[6] As with PO 1, a review of the underlying facts suggests that different labels may mask similar behavior. According to the discipline report, PO 2 "attempt[ed] to influence the course of an investigation by an outside agency *after having been ordered by a superior officer to have no involvement* with said investigation." Dotson App. 204 (emphasis added). The district court concluded that Dotson and PO 2 were not similarly situated because "[PO 2's] discipline did not relate to his behavior and attitude towards a supervisory official." Dotson App. 378.

---

[6] The record does not include SPD Rules of Conduct section 1.13(C)(1), the "Obedience to Orders" rule under which PO 2 was disciplined. *See* Syracuse App. 197–98 (omitting page 3 of the SPD Rules of Conduct).

This holding overstates this Court's similarity requirements. "[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Graham*, 230 F.3d at 40. A reasonable juror could conclude that the material similarity between Dotson's and PO 2's behavior is defiance of a supervisor's direct order, and that their behavior therefore warranted similar sanctions—attitudinal differences notwithstanding.

Similarly, a third male police officer, "PO 3," lost only two days' furlough for violating the SPD's "Cooperation, Coordination, and Courtesy" rule.[7] According to the discipline report, PO 3 was "not courteous and respectful" while "being counseled for his handling of a call by a supervisor." Dotson App. 207. Additional documentation explains that PO 3 "was *insubordinate* when he used *disrespectful* and *defiant* language toward a supervisor when being verbally counseled regarding his handling of a call." Dotson App. 208 (emphasis added). The district court concluded that Dotson and PO 3 were not similarly situated because of Dotson's "behavior in initiating confrontations and arguing with supervisory officers." Dotson App. 378 (emphasis added). As above, we find their conduct was similar enough that the court should have allowed a jury to consider whether Defendants acted with discriminatory intent in disciplining Dotson.

---

[7] The SPD Rules of Conduct section 1.14 (G)(2) requires that "[e]mployees . . . be courteous, respectful and professional at all times." Syracuse App. 197.

*Finally*, the district court erred in concluding that certain Defendants' sexist remarks did not create a triable issue as to whether the Defendants discriminated against Dotson. Although "[disparaging] comments, *without more*, cannot get a discrimination suit to a jury[,] . . . [w]hen . . . other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance." *Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 56 (2d Cir. 1998) (emphasis in original). When viewed in the above-described context of the Defendants' insubordination charge and disciplinary decision, the sexist remarks could support a finding of discrimination, even if standing alone they might not.

According to an interdepartmental memo, in 2004 Sweeny objected to female police officers working together in the same car. The memo quoted him as saying: "The broads can't work together. They'll just be calling for back up all the time and [there won't be] cars covering the other territories." Dotson App. 181. It also stated that Sweeny continued to separate female police officers until a superior told him not to make any changes to the officer schedules unless absolutely necessary. And in 2012, "[w]hile on duty and in the presence of numerous officers attending a roll call, . . . [Sweeny] verbally harassed a subordinate black female police officer with the demeaning comment 'she's angry. Come here you angry black woman.'" *Id.* at 192.

Additionally, according to an interdepartmental memo from 2010, Kleist also made negative comments about women. The memo stated that, in discussing an open

11

position, "Kleist . . . told [a police captain] to not hire any more females as they are the ones he's having problems with. . . . [H]e indicated that he thought another female would just add to the problems he's having with the female parking checkers and that they would teach the new one how to avoid work." Dotson App. 176.

The district court labeled this behavior as "stray sexist remarks" and explained that, "[a]t most, [Dotson's] evidence shows that Defendants Sweeny and Kleist harbored a general bias against women, but not that this attitude affected the decision to discipline her for insubordination." *Id.* at 414. This conclusion is not supported by the timing of the conduct. Kleist's sexist remarks occurred after Dotson's suspension. In light of the larger context, a reasonable juror could infer that when he reported a female employee for insubordination following a short disagreement over parking, Kleist harbored the same views that he expressed explicitly just two years later. Moreover, Sweeny's remarks came both before and after Dotson's suspension, and the 2012 comment evinces precisely the sort of bias that is allegedly at issue here: disproportionate intolerance for (perceived) anger and disrespect from a female subordinate. Again, a reasonable juror could infer that Sweeny's views influenced his treatment of Dotson, particularly in light of the differences in how Sweeny treated arguably similarly-situated male employees.

In short, the Defendants' sexist comments and behavior, when viewed alongside Dotson's other evidence of discrimination, create a triable issue of fact as to whether Dotson's suspension was motivated in part by sex discrimination.

12

We have considered the Defendants' remaining arguments and find them to be without merit. Accordingly, we **REVERSE** the judgment of the district court and **REMAND FOR TRIAL**.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk