Lawrence HALFOND, Michael Richstone and Peter Zullo, Plaintiffs,

v.

The LEGAL AID SOCIETY OF THE CITY OF NEW YORK, Defendant.

No. 95–CV–3718.

United States District Court, E.D. New York.

Sept. 2, 1998.

Warren H. Richmond, Northport, NY, Martin S. Dorfman, Lawrence Spirn, Woodbury, NY, for plaintiffs.

Stephanie G. Wheeler, David B. Tulchin, Sullivan & Cromwell, New York, NY, for defendant.

## MEMORANDUM & ORDER

KORMAN, District Judge.

Plaintiffs, Lawrence Halfond, Michael Richstone, and Peter Zullo, were fired or demoted from their positions as supervisors at Legal Aid in January 1995. They claim age discrimination. Legal Aid has moved for summary judgment, arguing that the termination and demotions were necessitated by a drastic reduction in Legal Aid's budget.

### The Plaintiffs

Lawrence Halfond was 62 years old when he was demoted. He had joined Legal Aid as a staff attorney in 1971, and was promoted to Assistant Complex Supervisor in 1978. In 1985, he was promoted to Complex Head. In 1986, he won the Orison S. Marden Award, which is given by Legal Aid each year to the Legal Aid attorney who best displays outstanding leadership qualities, scholarship qualities, and dedication to the ideals of the Legal Aid Society. Robert Baum, who served as Attorney–in–Charge of Legal Aid's Criminal Defense Division from 1988 to 1996 described Halfond as "one of the finest trial lawyers I've known" and an "excellent manager." Baum Dep. 9–11.

Michael Richstone was 52 years old when he was demoted. He had joined Legal Aid as a staff attorney in 1969, and was promoted to supervisor in 1972. Rich-

stone supervised the Senior Trial Attorney Bureau ("STAB") an "elite unit" of four very experienced trial attorneys who tried serious felony cases. Richstone Dep. 193–96, 281. Since 1991, he had also supervised the Youth Narcotic Drug Unit, a group of five experienced staff attorneys, social workers, and an administrator. Id. at 200–01. During his twenty-two years as a supervisor, Richstone received consistently positive evaluations, and his work as a supervisor was never criticized. Richstone Aff. ¶ 3. Dan Kessler, the Deputy Attorney-in-charge of the Criminal Defense Division described Richstone's performance as a supervisor as "very good, it was excellent." Kessler Dep. 19.

Peter Zullo was 53 years old when he was fired. Zullo had joined Legal Aid as a staff attorney in 1967, and was promoted to supervisor in 1975. Over the next twenty-three years, he served in a variety of supervisory positions, including Attorney–in–Charge, Complex Head, and Supervisor of the Queens Criminal Court. During this time, Zullo received favorable evaluations, Zullo Aff. ¶ 3, including statements by members of the judiciary praising his "capabilities, intellect, expertise, demeanor and work ethics", Ex. 67, and describing him as "the most effective supervisor in the Criminal Court system." Zullo Aff. Ex. A.

### Legal Aid's Reduction in Force

It is uncontested that Legal Aid was forced to reduce its supervisory staff through a combination of voluntary severance packages, demotions, and outright terminations, in response to budget cuts in late 1994. The present controversy revolves around Legal Aid's reasons for the demotions and terminations made during that reduction in force.

In late 1994, Tom Brome, the then-President of Legal Aid's Board of Directors, appointed an Ad Hoc Committee to recommend which supervisors should be retained, offered staff attorney positions, or

laid off. The Ad Hoc Committee was composed of Elaine Kurtz, Legal Aid's Human Resources Director, Michael Chepiga and Patricia Saunders, members of its Board, and Michael Dale, a law professor then serving as an outside consultant to Legal Aid.

The Ad Hoc Committee met on December 8 and 9, 1994, reviewed the files of Legal Aid's 83 supervisors who had not accepted voluntary buyouts, and made recommendations on a city-wide, rather than borough-by-borough, basis. Each supervisor's file contained an evaluation written by the heads of the supervisor's borough office, the supervisor's most recent performance evaluation completed by his or her immediate supervisor, a self-evaluation completed by the supervisor, letters, if any, submitted by judges or other members of the legal community in support of a supervisor, and largely anonymous performance evaluations completed by staff attorneys, supervisors, and support staff who had worked with the supervisor.

The Ad Hoc Committee members claim that, "[b]ased on the information in each supervisor's Ad Hoc Committee file, the Ad Hoc Committee evaluated the performance of each supervisor relative to all the others." Chepiga Aff. ¶ 5; Dale Aff. ¶ 5; Saunders Aff. ¶ 4; Kurtz Aff. ¶ 4. Similarly, they all state that the Committee's "evaluation was based solely on job-related criteria." Chepiga Aff. ¶ 5; Dale Aff. ¶ 5; Saunders Aff. ¶ 4.; Kurtz Aff. ¶ 4. Kurtz adds in her affidavit that the "job-related criteria" considered by the Ad Hoc Committee "includ[ed] a supervisor's knowledge of the law, competence in the courtroom, trial skills, mentoring and counseling abilities and administrative skills, among other things." Kurtz Aff. ¶ 4. Chepiga's and Saunders' affidavits explain only that the Committee "focused broadly on a supervisor's management and lawyering skills." Chepiga Aff. ¶ 5; Saunders Aff. ¶ 4.

Notwithstanding these affidavits, the precise methodology of the evaluation is unclear. The Ad Hoc Committee did not retain any contemporaneous records explaining why the Ad Hoc Committee actually made its decision to recommend terminating, demoting, or retaining a particular supervisor. The depositions also add very little. Dale, for example, testified that he had "very little recollection" of the evaluation process, other than the "development of a common articulation of points, though I don't remember what the particular points were." Dale Dep. 49–50. Chepiga similarly testified that "there was not a formalized checklist or list of standards." Chepiga Dep. 30.

The Ad Hoc Committee delivered its recommendations in three handwritten lists, one indicating the supervisors to be retained, one indicating the supervisors to be demoted to staff attorney, and one indicating the supervisors to be laid off. Ex. 82. In total, of the 61 supervisors *under* the age of 50, the Committee recommended that thirteen (21%) be terminated, that twenty-two (36%) be demoted, and that 26(43%) be retained as supervisors. Of the 22 supervisors *over* the age of 50, however, the Committee recommended that eleven (50%) be terminated, that seven (32%) be demoted, and that only four (18%) be retained as supervisors. Ex. 21. The Ad Hoc Committee recommended that Halfond and Zullo be terminated, because their performance "was not as strong as many other supervisors," and that Richstone be demoted because "he could function effectively as a staff attorney." Chepiga Aff. ¶ 8; Dale Aff. ¶ 8; Kurtz Aff. ¶ 6; Saunders Aff. ¶ 7. Significantly, none of the Ad Hoc Committee members stated that plaintiffs were not as "strong" as *all* of the supervisors who were actually retained or recommended for retention— many of whom were younger than plaintiffs. Nor have they given a specific rationale for their evaluations of the plaintiffs. Moreover, although they recommended that Halfond and Zullo be laid off instead of simply demoted, the members of the Ad Hoc Committee did not explain why Hal-

fond and Zullo could not function effectively as staff attorneys. Indeed, each of the affidavits filed in support of the summary judgment motion speak only of the overall intent of the Ad Hoc Committee, rather than the acts or motives of the individual affiant.

*Review of Committee's Recommendations*

The Ad Hoc Committee's recommendations were reviewed by Robert Baum, the Attorney in Charge of the Criminal Defense Division, and Dan Kessler and Ivar Goldart, the Deputy Attorneys in Charge of the Division ("the Review Committee"). Baum Aff. ¶ 3; Kessler Aff. ¶¶ 5, 6, 13; Baum Dep. 58; Kurtz Dep. 60–61. They were asked by Elaine Kurtz, the Human Resources Director, who also sat on the Ad Hoc Committee, to ensure that the results reached by the Ad Hoc Committee were not irrational (as Baum, Kessler, and Goldart had personal knowledge of the supervisors' performance), and to ensure that the layoffs and demotions were consistent with Legal Aid's commitment to have a diverse workforce. Baum Aff. ¶ 2; Kessler Aff. ¶ 2; Kurtz Dep. 61; Baum Dep. 60–63.

For the review, the Ad Hoc Committee's lists were typed up by Lisa Goldfarb, who worked in the Human Resources Department. Kurtz Dep. 58–60; Ex. 21. In addition to indicating the Ad Hoc Committee's recommendations, the typewritten lists included each supervisor's race, age, sex, and length of service. Ex. 21.[1] The Review Committee recommended several changes to these lists that were communicated to Elaine Kurtz for her ultimate approval. Baum Dep. 58–69. She accepted some of the Review Committee's changes and rejected others. *Id.* at 68–69.

The Review Committee rejected the recommendation that Halfond be laid off. Instead, Halfond was offered a position as a staff attorney, because Baum viewed him as an excellent trial attorney and noted that firing him would not speak well of the Legal Aid Society as he was a recipient of the Marden Award, Legal Aid's highest honor. Kurtz Aff. ¶ 9; Kurtz Dep. 78; Baum Dep. 60–61, 68. The Ad Hoc Committee's recommendations that Richstone become a staff attorney and that Zullo be laid off were not disturbed.

Overall, as a result of the Review Committee's suggestions to Elaine Kurtz and her actions upon them, seven (32%) of the 22 supervisors *over* the age of 50 were retained as supervisors, eight (36%) were demoted, and seven (32%) were terminated. Defendant's Response Letter of 6/29/1998, Ex. A. Of the 58 supervisors *under* the age of 50 on the final list, 31(53%) were retained, 21(36%) were demoted, and six (10%) were terminated. *Id.*

**DISCUSSION**

Plaintiffs claim that Legal Aid terminated or demoted them because of their age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623 *et seq.*, which prohibits age discrimination against workers who are over forty years old. Legal Aid responds that plaintiffs were laid off or demoted because Legal Aid was forced to make budget cuts, and plaintiffs were "not as strong as many other supervisors." Legal Aid seeks summary judgment.

In analyzing an age discrimination case, courts use the framework of Title VII cases that was articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Gallo v. Prudential Residential Servs., L.P.*, 22

---

1. Plaintiffs argue that these lists, which are dated December 6, 1994, shortly before the Ad Hoc Committee met, are evidence that the Ad Hoc Committee itself used and relied upon plaintiffs' ages in determining to demote or fire them. Although Legal Aid offers a benign explanation that suggests otherwise, it is likely that the Ad Hoc Committee could estimate a supervisor's age by reference to his or her length of service, which is shown in the performance evaluations in the supervisor's files.

F.3d 1219, 1224 (2d Cir.1994). Plaintiffs have the initial burden of setting forth a prima facie case of discrimination, which raises a presumption of discrimination. The burden then shifts to Legal Aid to articulate non-discriminatory reasons for the adverse actions taken against the plaintiffs. If Legal Aid meets this burden of production, the presumption of age discrimination drops out of the case, and plaintiffs then bear the burden of proving that Legal Aid's proffered explanation was pretextual and that age discrimination was a substantial reason for its actions. *Id.* Plaintiffs can do so either by introducing new evidence, or by resting on the prima facie case if it is sufficiently compelling to satisfy plaintiffs' burden of proof. *Cronin v. Aetna Life,* 46 F.3d 196, 204 (2d Cir. 1995); *Viola v. Philips Med. Sys.,* 42 F.3d 712, 716 (2d Cir.1994).

### 1. The Prima Facie Case

■ To establish a prima facie case of age discrimination, plaintiffs must show (1) that they are members of the protected class; (2) that they were qualified for their positions; (3) that they were discharged or demoted; and (4) that the discharges or demotions occurred under circumstances giving rise to an inference of age discrimination. *Gallo,* 22 F.3d at 1224. It is undisputed that plaintiffs were within the protected age group when they were discharged or demoted. Although Legal Aid argues that plaintiffs had weaker evaluations than the other supervisors, Legal Aid does not appear to contest the second prong of their prima facie case. Indeed, "all of the discharged employees are arguably qualified in work force reductions." *Barnes v. GenCorp, Inc.,* 896 F.2d 1457, 1466 (6th Cir.), *cert. denied,* 498 U.S. 878, 111 S.Ct. 211, 112 L.Ed.2d 171 (1990). Moreover, it is also undisputed that, notwithstanding their qualifications, plaintiffs were discharged or demoted. Legal Aid argues, however, that plaintiffs have not presented evidence that satisfies the fourth element, i.e., that they were discharged or demoted under circumstances

giving rise to an inference of age discrimination.

■ In an age discrimination case, a plaintiff may make use of direct, statistical, and circumstantial evidence. *Haskell v. Kaman Corp.,* 743 F.2d 113, 119 (2d Cir. 1984). Specifically, the Second Circuit "ha[s] stressed that the similarity of the jobs held by an older and younger employee is the touchstone for determining whether a lay-off of the older may be found to be an ADEA violation by the trier of fact." *Burger v. New York Institute of Technology,* 94 F.3d 830, 833 (2d Cir.1996). *See id.* at 834 (citing *Smith v. Cook County,* 74 F.3d 829, 831 (7th Cir.1996) (holding that fourth element of a prima facie case is satisfied when "the employees who were more favorably treated [were] situated similarly to the plaintiff"); *Branson v. Price River Coal Co.,* 853 F.2d 768, 771 (10th Cir.1988) (holding that "[e]vidence that an employer fired qualified older employees but retained younger ones in similar positions is sufficient to create a rebuttable presumption of discriminatory intent and to require the employer to articulate reasons for its decision")).

■ The evidence here is not disputed that Legal Aid fired or demoted qualified older employees but retained younger ones in identical positions. Indeed, here plaintiffs have adduced evidence of a statistically significant disparity in the treatment of older supervisors. Specifically, as a result of the combined action of the Ad Hoc and Review Committees, only 32 percent of the supervisors *over* the age of 50 were retained, in contrast to 53 percent of those *under* the age of 50. Moreover, while the average age of the supervisors prior to the reduction in force was 46.7, Plaintiffs' Response Letter of 6/29/1998, at 2, and the average age of the retained supervisors was 45.35, the average age of the terminated supervisors was 52.36. Defendant's Response Letter of 6/29/1998, at 2.

Legal Aid argues that these final statistics, which reflect the combined efforts of

the Ad Hoc and Review Committees and are somewhat more favorable to plaintiffs than the statistics for the Ad Hoc Committee alone, should not be considered because plaintiffs do not allege age bias on the part of the Review Committee. The issue here, however, is whether age was a substantial factor in the adverse employment decision taken against plaintiffs by the *Legal Aid Society.* Cplt. ¶ 36. Indeed, the final statistics reflect the ultimate acceptance and rejections by Elaine Kurtz of the recommendations by the Review Committee. Since Kurtz was also a member of the Ad Hoc Committee, it is difficult to attribute the final statistics solely to the Review Committee. Moreover, even if the Review Committee decisions were not motivated by age bias, it is a reasonable inference at this stage of the four-part test that the Ad Hoc's Committee's recommendations provided an age-biased framework which may have been exacerbated by the allegedly "neutral grounds"—race and sex—employed by the Review Committee.

Nor is it accurate, as Legal Aid argues, that "[b]ecause plaintiffs' statistics are based solely on the supervisors' ages and do not take into account the performance evaluations on which the Ad Hoc Committee's recommendations were based, the statistics are insufficient as a matter of law to demonstrate pretext." Defendant's Reply Brief at 14. While it may be true that "statistics are impotent, without more, to rebut [an employer's] particularized reasons for the termination [or demotion]" of an employee, *E.E.O.C. v. Texas Instruments Inc.,* 100 F.3d 1173, 1185 (5th Cir. 1996), they are relevant at this stage of the proceeding to establish the prima facie case. *Id.* As the Sixth Circuit has explained, because "all of the discharged [or demoted] employees are arguably qualified in work force reductions, the most obvious explanations for the discharge [or demotion] of any one employee are lower proficiency and/or random chance. Since it is

reasonable to presume at this stage of the case that skill is distributed randomly over any given age group and since the plaintiffs have shown that the results depart significantly from those that chance alone would predict," plaintiffs' statistics, "on their face, establish a prima facie case of discrimination." *Barnes,* 896 F.2d at 1466; cf., *United States v. Alvarado,* 923 F.2d 253, 256 (2d Cir.1991) ("a challenge rate nearly twice the likely minority percentage of the venire strongly supports a *prima facie* case under [*Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)]").

Nevertheless, it is unnecessary to decide whether the statistical evidence offered here would be sufficient, without more, to establish a prima facie case. Plaintiffs have buttressed their statistical evidence with evidence that at least one member of the Ad Hoc Committee had noted management's preference for "younger supervisors." Specifically, Dale had written a memorandum that noted that Mr. Kessler (a member of the final, decision-making Review Committee) had told him that:

> in terms of caseload there is a wide variety of approach by supervisors. Management encourages supervisors to carry some cases. Younger supervisors tend to have cases. Older supervisors don't.... Management wants more of a mix where supervisors have their own cases and supervise younger lawyers.

Ex. 105. Kessler's comment to Dale is relevant because it suggests that a member of the Review Committee might have used a categorical stereotype in evaluating the supervisors. Moreover, at this stage of the four-step process, plaintiffs are entitled to the inference that Dale, to whom Kessler's comment was conveyed, if not the other members of the Ad Hoc Committee, may have relied on Kessler's comment and used age as a proxy for a willingness or ability to carry cases when recommending the firing or demotion of more than

eighty percent of the older supervisors.[2] Under these circumstances, Kessler's comment is far more telling than the comparatively innocuous "alt[e] cockers" comment found to be probative on the issue of whether a defendant was entitled to summary judgment in *Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 56 (2d Cir.1998). *See also Gusman v. Unisys Corp.*, 986 F.2d 1146, 1147 (7th Cir.1993) (Easterbrook, J.) ("Ample evidence warranted a conclusion that Gusman's immediate superior ... believed that older workers are inferior.").

There is still more to plaintiffs' prima facie case. Plaintiffs cite a "Supervising Attorneys' Summary Sheet" with Kurtz's handwriting on it, Ex. 83, which was found in one supervisor's file but in none of the others. The Summary Sheet has room for comments, apparently for the Ad Hoc Committee members (Saunders, Chepiga, Kurtz, and Dale) to summarize their evaluations of the supervisors. No satisfactory explanation is offered for the absence of summary sheets in the other files. The lack of Summary Sheets—or their equivalent—in any of the other supervisors' files is troubling, particularly where, as here, Legal Aid clearly knew that its decision would be subject to scrutiny. As Judge James H. Michael has observed:

> For twenty five years all that the *McDonnell Douglas* presumption of discrimination has required of American business and governmental agencies is that they document their employment decisions so as to leave an adequate record of nondiscriminatory bases for such actions. The [defendant] here failed to live up to that very minimal obligation—an obligation imposed both by law and by practical business necessity.

*Prudencio v. Runyon*, 986 F.Supp. 343, 349 n. 8(W.D.Va.1997).

**2.** Dale denied that he was influenced by Kessler's comment, asserting that he "[did]n't know what he meant by the term 'older.'" Dale Dep. 89. Dale's assertion, for what it is worth, may be a matter of fact for the jury to

Here, although members of the Ad Hoc Committee claim to have used materials such as post-it notes and legal pads instead of the Summary Sheets to record pertinent information from the particular files, Saunders Dep. 14–15; Chepiga Dep. 23–24; Kurtz Dep. 68, none of these contemporaneous documents are in the record. Under these circumstances, the question of whether Legal Aid destroyed, concealed, or deliberately failed to create records "is a question of fact like any other, so the trier of fact is entitled to draw any reasonable inference." *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998) (Easterbrook, J.).

Taken together, the statistical disparity in the treatment of older supervisors, the ability of the Ad Hoc Committee to at least estimate the ages of the supervisors, *see supra* n. 1, the uncontested knowledge of age by the Reviewing Committee, the lack of any documentary evidence of how Legal Aid made its decisions, and the comments by Kessler to Dale suffice to establish a prima facie case of age discrimination. Nor is plaintiffs' case undermined by the fact that members of the Ad Hoc and Review Committees were themselves in the category protected by the ADEA. "The proposition that people in a protected category cannot discriminate against their fellow class members is patently untenable." *Danzer v. Norden Systems*, 151 F.3d at 55.

#### 2. Legal Aid's Proffered Explanation

Because the plaintiffs have established a prima facie case of discrimination, the burden shifts to Legal Aid to articulate clear and reasonably specific nondiscriminatory reasons for the demotions and termination. Although Legal Aid need not, at this stage, establish that its explanation is true, its explanation must be "clear and

consider. It is insufficient at this stage to undermine the inference that plaintiffs are entitled to draw from it in establishing their prima facie case.

reasonably specific." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 258, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). This requirement "arises both from the necessity of rebutting the inference of discrimination arising from the prima facie case and from the requirement that the plaintiff be afforded 'a full and fair opportunity' to demonstrate pretext." *Id.* As the Second Circuit recently summarized the prevailing law:

> "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. The presumption means that, unless the defendant comes forward with a non-discriminatory reason for the action complained of, the plaintiff's case may go to the jury, even though the prima facie case might be insufficient—apart from the presumption—to meet the plaintiff's ultimate burden of showing discrimination; indeed, in such a circumstance the jury must rule for the plaintiff unless the employer submits evidence that places in doubt the facts underlying plaintiff's prima facie case (such as plaintiff's qualification for the job), or furnishes a satisfactory explanation for its inability to tell the reason why plaintiff was disfavored. *See St. Mary's Honor Center v. Hicks*, 509 U.S. [502,] 509, 113 S.Ct. [2742,] 2748[, 125 L.Ed.2d 407 (1993)].

*Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir.1997) (en banc), *cert. denied*, 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998).

█ The only explanation the Ad Hoc Committee members have given for their recommendation that Halfond and Zullo be fired, and that Richstone be demoted, is that the Ad Hoc Committee (as opposed to the individual affiants) concluded that Hal-

fond and Zullo were "not as strong as many other supervisors," and Richstone "could function effectively as a staff attorney." Chepiga Aff. ¶ 8; Dale Aff. ¶ 8; Kurtz Aff. ¶ 6; Saunders Aff. ¶ 7. These vague articulations do not make clear that plaintiffs were less "strong" than all of the younger supervisors who were actually retained or recommended for retention.

Nor do the affidavits or depositions of the Review Committee members give any specific explanations of why they accepted the Ad Hoc Committee's recommendations relating to Richstone and Zullo.[3] Indeed, although Baum testified that the Review Committee recommended that Halfond be retained as a supervisor, Baum Dep. 61, that recommendation was rejected by Kurtz for reasons that have not been provided. *Id.* at 68. Moreover, although diversity is asserted to have been a factor considered by the Review Committee, Baum Dep. 62–63, none of its members say that race or sex was a significant factor in their decision to acquiesce in the termination of Zullo and the demotion of Richstone, or their failure to restore Halfond to his position.

In essence, Legal Aid's vague and ambiguous explanation does not "frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 255–56, 101 S.Ct. 1089. *See Grier v. Secretary of the Navy of the United States*, 677 F.Supp. 362, 367 (E.D.Pa. 1987), where the district court held that a Title VII defendant "failed to articulate a clear and reasonably specific, legitimate, nondiscriminatory reason" for employment action where it offered mere testimony that "only 'highly qualified' individuals were selected [for promotion] and that [the plaintiff] was not found to be 'highly qualified.' "[4]

---

**3.** At most, Baum states why he agreed that Zullo should not be retained as a staff attorney, but he still does not explain why Zullo

was not retained as a supervisor in the first instance. Baum Dep. 64.

**4.** The district court in *Grier* found the defendant's proffered nondiscriminatory reason

Legal Aid has, in arguments of counsel, pointed to portions of plaintiffs' files that might support or explain the Committees' decisions. However, "the defendant cannot meet its burden merely through an answer to the complaint or by argument of counsel." *Burdine*, 450 U.S. at 255 n. 9, 101 S.Ct. 1089; *see also Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 28–29, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978) (Stevens, J., dissenting) ("In litigation the only way a defendant can 'articulate' the reason for his action is by adducing evidence that explains what he has done; when an executive takes the stand to 'articulate' his reason, the litigant for whom he speaks is thereby proving those reasons.").

Moreover, "[i]f there was no evidence that asserted reasons for discharge were actually relied on, the reasons are not sufficient to meet defendant's rebuttal burden." *Lee v. Russell County Board of Education*, 684 F.2d 769, 775 (11th Cir. 1982). Here, the members of the Ad Hoc and Review Committees have not identified the reasons now asserted as those upon which they relied in making their specific evaluations. On the contrary, a not insignificant portion of Legal Aid's argument rests upon anonymous evaluations, *see* Defendant's Brief at 17–23, the reliability of which was questioned by the members of the Ad Hoc Committee themselves. Dale Dep. 52–53 ("I think there's a concern that people anonymously might say things for hurtful or inappropriate reasons" and the Ad Hoc committee "discussed [the issues] at length trying to figure out what was the right thing to do").

In sum, what is singularly lacking here is an affidavit from any participant in the process that explains in any meaningful way why adverse actions were taken against any of the plaintiffs as opposed to other, younger supervisors. Had such af-

fidavits been submitted, they would have been sufficient to rebut the *McDonnell Douglas* presumption of discrimination, particularly if they were consistent with the evidence cited by counsel. *See, e.g., Drew v. Pennsylvania Human Relations Commission*, 688 A.2d 274, 277 (Pa.Comm. 1997) (holding that defendant's proffered reason for not promoting plaintiff was sufficient where it "presented the testimony of three of the four board members on the board's evaluation of [the plaintiff] in comparison to the chosen candidates, that is, the relative qualifications of [the chosen candidates], and on [their] concerns raised with [the plaintiff's] qualifications, such as his disciplinary transfer, his refusal to follow department regulations, and his failure to follow instructions for the application").

Since Legal Aid has failed to submit affidavits or deposition testimony containing sufficiently "clear and reasonably specific" reasons for its adverse employment actions against plaintiffs, it has failed to overcome their prima facie case. Accordingly, Legal Aid's motion for summary judgment is denied.

**SO ORDERED.**

---

lacking because it did not produce the "merit promotion package" it used to rank candidates for promotion, and did not offer testimony of any witness with knowledge of the

package's contents or of the reasons why the plaintiff was not promoted. *Grier*, 677 F.Supp. at 367.