**Donna BATES, Plaintiff,**

v.

**GREYHOUND LINES, INC., Defendant.**

**No. 4:97CV394–RH.**

United States District Court, N.D. Florida, Tallahassee Division.

Jan. 21, 2000.

Marie A. Mattox, Mattox & Hood PA, Tallahassee, FL, for Donna Bates, plaintiff.

Darren Alter Schwartz, D. Andrew Byrne, Cooper Byrne Blue Etc, Tallahassee, FL, for Greyhound Lines Inc, defendant.

## ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW OR NEW TRIAL

HINKLE, District Judge.

Plaintiff Donna Bates was an employee of defendant Greyhound Lines, Inc. She asserts that Greyhound fired her because of her race. A jury agreed and awarded damages. Greyhound now moves for judgment as a matter of law or for a new trial, asserting there was no evidence from which a jury reasonably could have found the firing motivated by race. I deny the motion.

### FACTS[1]

#### Ms. Bates's Employment

Greyhound is a national bus line with corporate headquarters in Dallas, Texas.

---

1. On Greyhound's motion for judgment as a matter of law, the evidence should be reviewed "in the light most favorable to, and with all reasonable inferences drawn in favor of," Ms. Bates. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir.1999) (*en banc*).

On Greyhound's motion for new trial, the weight of the evidence also is relevant. In this order, where factual disputes are significant, they are noted, and the conflicting testimony is described. The facts are generally

Greyhound has district offices in various locations that oversee the individual terminals located in the many cities the company serves. The district office that oversees the Tallahassee terminal is in Savannah, Georgia.

Ms. Bates started work for Greyhound at its Pensacola terminal in 1993. (Tr. 237, 239; Pl.Ex. 249.) In July 1995, she sought and obtained a transfer to the Tallahassee terminal, in order to increase her hours. (Tr. 239.) As a customer service agent, she sold tickets (including for cash) and performed various other duties. (Tr. 241–42.) Ms. Bates was, according to her terminal managers, an excellent employee. (Tr. 113, 134–35.) Greyhound apparently acknowledges this. (Tr. 87.) On May 10, 1996, however, Greyhound fired Ms. Bates, ostensibly because her $496 deposit of one day's cash receipts was missing when Greyhound's safe was opened the following morning. (Tr. 254.)

### The Cash Deposit System

At the end of each day, each customer service agent balanced his or her cash drawer (much as a bank teller would do), placed his or her cash into an envelope, and inserted the envelope into a freestanding safe on Greyhound's premises. (Tr. 247–48; Pl.Ex. 249.) Prior to April 1996, Greyhound's policy called for each customer service agent to have each deposit verified and witnessed by another customer service agent. (Tr. 247–48; Pl. Ex. 249.) In April 1996, Greyhound discontinued the requirement for dual verification and witnessing, leaving each customer service agent solely responsible for his or her own deposit. (Tr. 248; Pl.Ex. 245a.)

A Wells Fargo employee, in the presence of a designated Greyhound employee, picked up the deposits directly from the safe the next morning. (Tr. 252–53.) If working properly, the safe could be opened only by the Wells Fargo employee (who had a necessary key) and Greyhound employee jointly, thus assuring that any deposit made by a customer service agent at the end of a day would be present when the safe was opened by the Wells Fargo employee the next morning. (*Id.*) But the safe did not always work properly; it could be opened without the key by applying pressure to or kicking the handle. (Tr. 211–12.) When terminal manager Sheila Smith learned this in December 1995, she called a repairman, who told her the safe was "just too old, the hinges were bad, the handle would stick." (Tr. 152.) He said "there wasn't much he could do to it." (*Id.*) The repairman "oiled things, he tightened springs," (*id.*), and he changed the key and combination, (Tr. 199), but the safe still could be opened inappropriately, at least if it had not been properly locked; one "had to be real careful" to lock the safe properly. (Tr. 199; *see also* Tr. 215–16.) Ms. Smith reported the situation to corporate headquarters in Dallas and was promised a response, but she never received one. (Tr. 152–53.) The defective safe remained in use throughout the period at issue. (Tr. 214–15.)

### The Missing Deposits

Ms. Bates performed her duty of accounting for her cash proceeds particularly well; she balanced to the penny every day. (Tr. 113.) This placed her performance markedly ahead of at least some other customer service agents. Shortages in the Tallahassee terminal among other customer service agents were not uncommon. (Tr. 119–20, 140–41, 144, 151, 156, 213.)

On two occasions, however, a deposit made by Ms. Bates was missing when the safe was opened the next morning. (Tr. 249–53.)

The first instance was in December 1995 (Tr. 249), when Greyhound's dual verification and witnessing requirement was still in effect. (Tr. 248.) Ms. Bates and another employee, Barbara James, verified the deposit at issue and dropped it in the safe. (Tr. 249, 151.) It was the absence of this

set forth in the light most favorable to Ms. Bates.

deposit from the safe the next morning that led to the disclosure by yet another employee, Albert Joseph, that the safe could be opened by pressing on or kicking the handle; Mr. Joseph demonstrated this to then terminal· manager Sheila Smith. (Tr. 211–12, 151–52.) Ms. Smith imposed no discipline on Ms. Bates or, apparently, on Ms. James, because she had no way of knowing whether someone else opened the safe and took the deposit. (Tr. 152.) [2] Greyhound makes no claim that Ms. Bates did anything wrong in her handling of this deposit.

The second missing deposit occurred in May 1996 and led to Ms. Bates's firing. (Tr. 250–54.) By that time Greyhound no longer required deposits to be verified or witnessed by another employee. (Tr. 248.) Even so, Ms. Bates had continued her practice of having her deposits to the safe witnessed by another employee, perhaps because she did not trust the safe. (Tr. 248, 250–51.) On the afternoon of May 8, 1996, Ms. Bates balanced her transactions and compiled her cash deposit as usual. (Tr. 250–51.) She asked a new employee she had been training to witness her deposit, and the new employee did so. (Tr. 250–51.) Ms. Bates heard the deposit (which included change) drop to the bottom of the safe, assuring it had been properly inserted all the way into the safe. (Tr. 251.)

When the safe was opened by the Wells Fargo representative the next morning, however, Ms. Bates's deposit was missing. (Tr. 252–53.)

Ms. Bates worked all that day and the next. (Tr. 253–54.) At the end of that next day, May 10, 1996, Greyhound's new terminal manager Xavier Collins called Ms. Bates into his office. (Tr. 254.) Mr. Collins asked Ms. Bates what happened to her May 8 deposit. (*Id.*) Ms. Bates said she dropped the deposit in the safe, exactly as she was supposed to do. (*Id.*) Mr. Collins showed Ms. Bates a standard Greyhound form she had signed saying, "I understand that any mishandling or carelessness related to monies entrusted to my care, in the conduct of the company's business, will result in my dismissal." (Pl.Ex. 249; Tr. 254.) Mr. Collins asked Ms. Bates whether it was her signature on the form. (Tr. 254.) When she said it was, Mr. Collins said, "According to this, I have to terminate you." (*Id.*) Ms. Bates was fired, effective immediately. (Tr. 254–55.) [3]

The testimony in this record is uncontradicted that Ms. Bates handled the deposit properly in all respects and that, if Greyhound had checked with the new employee, Greyhound would have been able to verify that. (*E.g.,* Tr. 250–51.) Greyhound apparently makes no claim that Ms. Bates failed to handle the deposit properly in any respect or otherwise did anything wrong.

It is arguable, of course, that the fact that the deposit was missing, standing alone, would support an inference that Ms. Bates did not put the money in the safe. Given the defect in the safe and the uncontradicted testimony that the deposit was witnessed by another employee, any such

2. Ms. Smith did not discipline Ms. Bates. (Tr. 152.) She testified inconsistently about whether she disciplined Ms. James; she first said she did not (Tr. 152), but later said she suspended Ms. James for three days she would have been off anyway, causing no loss of pay or other meaningful result. (Tr. 194–96.)

3. Greyhound asserts its policy on missing deposits and other shortages was accurately set forth in the forms of this type that new employees routinely were asked to sign. Ms. Bates signed two such forms, one soon

after she was hired in Pensacola in 1993, and another when the policy changed in other respects (to eliminate the dual verification requirement) in April 1996. Prior to terminating her, Mr. Collins showed Ms. Bates the earlier, out-of-date form. (Tr. 256–57; Pl.Ex. 245a.) This did not matter; both the out-of-date version and the revised version included exactly the same language on mishandling or carelessness related to company funds, as quoted in the text, above. (*Compare* Pl.Ex. 249 *with* Pl.Ex. 245a.)

inference would be weak. Greyhound made no assertion at trial that Ms. Bates failed to make the deposit as she claimed, nor did Greyhound present any evidence that any Greyhound official believed, at the time Ms. Bates was fired, that she had failed to make the deposit properly.

### Greyhound's Alleged Automatic Termination Policy

Greyhound says in its briefs that its policy was to fire employees, no matter how innocent, whose deposits turned up missing. Greyhound says this automatic termination policy required Ms. Bates's termination, even if she did nothing wrong.

Greyhound's written policy, however, as set forth in the form employees were asked to sign as quoted above, was not nearly so clear. (Pl.Ex.245a.) That policy called for termination of employees for "mishandling or carelessness" related to company funds; it said nothing about terminating an employee who did not mishandle funds and was not careless but whose deposit nevertheless came up missing, perhaps because of a defective safe.

Moreover, in their testimony, Greyhound's officials also were not as unequivocal as Greyhound now would have it. The only terminal managers who testified, Joel Burnham (who was there when Ms. Bates came to Tallahassee) and Sheila Smith (who was terminal manager from September 1995 to April 29, 1996 (Tr. 128, 172)), said employees ordinarily were *not* fired for missing deposits. (Tr. 118–20, 140–46, 151.) By the time at issue, they were no longer with Greyhound; a new terminal

manager, Xavier Collins, had taken over. He did not testify. The district manager, Howard Segal, said he did not know the practice in Tallahassee. (Tr. 417.) Myron H. Watkins, Jr., who was Greyhound's national Vice President of Customer Operations from June 1995 until March 1996 and in that capacity dealt with policies of this type, testified that Greyhound's policy was (and always had been) that any employee with a missing deposit was terminated. (Tr. 391, 399.) Mr. Watkins acknowledged, however, that in enforcing this policy, "We always have to look at the facts." (Tr. 410.) He tried to soften this admission by saying that, in the case of a missing deposit, there is only one fact: the envelope is there or it is not. (Tr. 411.) He apparently did not consider the possible fact that a safe was old and did not work properly, but his statement that, "We always have to look at the facts," makes it at least unclear any national policy would require termination of an employee who properly made a deposit that later went missing because of a broken safe. Moreover, Mr. Watkins acknowledged that he did not know the actual practice in the various districts, as distinguished from the announced corporate policy. (Tr. 409.)[4]

In short, nobody testified that either a national policy or a prevailing practice in the Tallahassee terminal called for termination of an employee under circumstances such as these. And, perhaps more significantly, nobody testified that Ms. Bates was in fact fired based on any such national policy or prevailing practice.[5]

---

4. Mr. Watkins said that in July 1996—two months after Ms. Bates was fired—the national office asked the various districts for information on their actual practices regarding missing deposits and other shortages (Tr. 411), thus apparently confirming that the national office had reason to believe the actual practice did not always conform to the announced national policy. Greyhound offered no evidence of the response it received from the various offices.

5. Mr. Watkins, the corporate vice president, apparently had no involvement in the firing of

Ms. Bates; his testimony addressed policies in general but not the actual facts of this firing. Mr. Segal, the district manager, did not testify in either plaintiff's or defendant's case in chief, was called as a rebuttal witness by plaintiff, but addressed only other matters, not the actual firing of Ms. Bates or the reasons for that firing. Mr. Collins, the terminal manager who advised Ms. Bates she was fired, did not testify. Greyhound asserted in opening statement that Mr. Segal and Mr. Collins struggled with the decision whether to fire Ms. Bates for two days (Tr. 86), but no testimony was offered regarding any such

### Other Shortages

The May 8, 1996 missing deposit was by no means the only cash that had come up missing at the Tallahassee terminal. (Tr. 120, 140–41, 144, 151, 156, 213.) As set forth above, in December 1995 a deposit by Ms. Bates and Ms. James was missing, but they were neither fired nor required to repay the amount of the deposit, apparently because it was clear that the safe could have been opened by unauthorized persons. (Tr. 151–52, 249.) In addition, other customer service agents had frequently been short (Tr. 118–20, 144, 213), and one missed a deposit or was otherwise short more than $800 (Tr. 143), resulting not in their firing but only in a requirement that they pay the money back in installments. (Tr. 118–20, 140–44, 156, 213.) Greyhound's auditor, from the national office in Dallas, had approved the pay-back practice. (Tr. 141, 143.) [6]

In addition, during a period of months ending in April 1996, other customer service agents in Tallahassee engaged in a pattern of falsifying ticket sale entries, in effect pocketing the cash proceeds of ticket sales without reporting that the tickets had been sold and the customers had been transported. (Tr. 155–58.) In this way the agents carried out one of the largest cash defalcations in Greyhound history, resulting in the loss of approximately $51,000. (Tr. 155–58, 401.) Nine employees, all African American (Tr. 158), were suspended but not fired on April 22, 1996 (Tr. 162), and they returned to work shortly before Ms. Bates's May 10, 1996 termination. (Tr. 257, 259–60.)

Prior to the firing of Ms. Bates, no Tallahassee employee had ever been fired for a missing deposit or other form of cash shortage. (Tr. 118–20, 140–41, 144, 156, 213.) All of the customer service agents involved in these various incidents, other than Ms. Bates, were African American. (Tr. 100, 158, 258, 419.) For all this record shows, every African American who had a missing deposit or other shortage kept his or her job, whereas on the only occasion when there was a missing deposit or other shortage involving only a white employee, the employee (Ms. Bates) was fired.[7]

### Racial Issues in the Terminal

Ms. Bates's tenure in the Tallahassee terminal occurred against a backdrop of racial difficulties. The workforce in the terminal was overwhelmingly African American. (Tr. 100.) At the end of 1994, well prior to Ms. Bates's arrival in Tallahassee, Greyhound transferred in a new terminal manager, Joel Burnham, who is white. (Tr. 94, 96.) The district manager, Mr. Segal, who also is white, suggested Mr. Burnham hire more whites. (Tr. 101.) Ms. Bates arrived in July 1995 as the only white customer service agent on her shift and apparently the only white customer service agent period. (Tr. 100, 258.) In early September 1995, less than two months after Ms. Bates's arrival, two African American employees filed racial discrimination charges with the Equal Employment Opportunity Commission, apparently alleging Ms. Bates's compensation was higher than theirs based on race. (Tr. 204, 114–15.) Within the week, Mr. Burnham was fired. (Tr. 114–15.)

---

struggle or, indeed, as to who made the firing decision or why. If there had been a policy as clear as Greyhound now says, it presumably would not have taken two days to decide whether to fire Ms. Bates.

**6.** Greyhound asserts the payback practice did not apply to missing deposits but only to other shortages. The witnesses with knowledge of Tallahassee practices, however, apparently drew no distinction between missing deposits and other shortages. (Tr. 118–20, 143, 146.) They said shortages or missing deposits could be paid back and that nobody had ever been fired for such offenses. (Tr. 118–20, 122, 140–46, 151.)

**7.** On an earlier occasion, four employees were fired under other circumstances, not involving any missing deposit and apparently not involving any shortage or loss of funds of any kind, but instead involving a failure properly to document transactions. (Tr. 104–07.) Neither side apparently claims those firings are relevant here.

Mr. Burnham was replaced by Sheila Smith, a white woman whom Greyhound transferred from Ocala. (Tr. 128.) Soon after Ms. Smith came to Tallahassee, Don Briggs, a senior manager for human resources at national headquarters in Dallas, told Ms. Smith the Tallahassee terminal needed a black male supervisor. (Tr. 131.) Ms. Smith ignored the comment. (*Id.*)

In late 1995 or early 1996, Ms. Smith determined that Ms. Bates should be promoted to the position of lead agent for her shift, a position entailing greater responsibility and higher pay than a regular customer service agent. (Tr. 135–39.) Ms. Smith thought there needed to be a lead agent on that shift (other than the existing lead who worked outside on the loading platform) and that Ms. Bates was the most qualified person for the job. (Tr. 135, 138.) Mr. Briggs, who was involved in Tallahassee personnel matters because of the pending EEOC charges, vetoed the promotion, saying it "would probably be detrimental to the terminal operations." (Tr. 137.) Mr. Briggs said Ms. Bates was one of the main reasons for the pending EEOC charges by black employees, that Ms. Smith should "sit on" Ms. Bates at her current pay, and that maybe Ms. Bates would quit. (*Id.*) Ms. Smith told Ms. Bates the reason she was not being promoted was that the terminal's black employees "would have a fit." (Tr. 140.)

Ms. Smith ultimately was replaced as of April 29, 1996, by Xavier Collins, an African American. (Tr. 162, 169, 172.) Ms. Bates was fired less than two weeks later.

## DISCUSSION

### I. APPLICABLE LEGAL STANDARDS

Title VII of the Civil Rights Act of 1964, as amended, prohibits discrimination in employment based on race or other prohibited characteristics. *See* 42 U.S.C. § 2000e–2(a)(1). An employer may not lawfully fire an employee because of the employee's race.

Ms. Bates has presented no "direct" evidence that her termination was based on race. Her claim thus must be analyzed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253–54, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Under that framework, the initial burden is on the plaintiff to establish a prima facie case. The Eleventh Circuit has defined a prima facie case for purposes of disparate treatment cases (such as the case at bar) as follows:

> To establish a prima facie case of disparate treatment, [plaintiff] must show: (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated [employees who are not members of the protected class] more favorably; and (4) she was qualified for the job. See, e.g., *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir.1984); see also *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

*Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir.1999).

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to present evidence that it acted for a legitimate, non-discriminatory reason. While this burden is "exceedingly light," *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir.1997), it cannot be met solely by a defendant's presentation of legal argument; the defendant must present "admissible evidence" of the reason for the action at issue. *See, e.g., Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Lee v. Russell County Bd. of Educ.*, 684 F.2d 769, 775 (11th Cir.1982). So long as the articulated reason is not based on race or

other prohibited characteristics, it need not be a reason that seems wise or logical; under Title VII, an employer lawfully may take action against an employee for any non-discriminatory reason, good or bad, fair or unfair, or for no reason at all. *See, e.g., Combs v. Plantation Patterns,* 106 F.3d 1519, 1543 (11th Cir.1997) (noting that employee cannot overcome employer's proffered reason "merely by questioning the wisdom of the employer's reason").

If the defendant meets the requirement of presenting evidence of a non-discriminatory reason for its action, the burden is on the plaintiff to establish that defendant's proffered reason is pretextual and that the plaintiff has been the victim of discrimination.

## II. PLAINTIFF'S PRIMA FACIE CASE

In the case at bar, it is uncontested that Ms. Bates met the first, second and fourth elements of a prima facie case. First, she is white. A race constitutes a protected class under Title VII, and Ms. Bates is a member of a race (white) that she asserts was the subject of the discrimination at issue.[8] Second, Ms. Bates was subjected to adverse employment action; she was fired. And finally, Ms. Bates was qualified for the job; indeed, she had performed the job well for an extended period.

The only issue, then, is whether Ms. Bates met the third element of a prima facie case by showing that Greyhound "treated similarly situated [African American] employees more favorably." *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir.1999). I conclude that Ms. Bates met this requirement.

 Applying this standard requires a determination of what it means to be "similarly situated." This, in turn, requires a determination of the appropriate level of generality, that is, a determination of what characteristics Ms. Bates and her comparators must have in common in order to be regarded as "similar." Where, as here, the issue is employee discipline, other employees are "similarly situated" only if their conduct is "nearly identical" in relevant respects to that of the plaintiff; courts must not second guess employers' reasonable decisions. *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir.1999). There are at least four possible levels of generality that could be chosen here, the first three of which would result in a determination that Greyhound treated "similarly situated" employees more favorably than Ms. Bates, and the fourth of which I conclude would clearly be an inappropriate standard based on the evidence in this record.

The first level of generality would classify Ms. Bates as a Tallahassee customer service agent who never mishandled or was careless with company funds but who, instead, made every deposit exactly as she was supposed to do. Greyhound clearly did not fire all African Americans in this category; instead, the only such employee Greyhound fired was Ms. Bates. At this level of generality, therefore, Greyhound treated "similarly situated" African American employees more favorably than Ms. Bates.

I conclude, however, that this level of generality is too high. Even if, as this record apparently establishes, Ms. Bates performed her work well and never mishandled or was careless with company funds, the fact would remain that one of her deposits turned up missing. It is clear, even in the absence of testimony concerning who actually decided to fire Ms. Bates or why, that the missing deposit led to the firing. A definition of "similarly situated" that omitted reference to the

---

**8.** Cases recognizing that whites constitute a protected class under Title VII include *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 279, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). Greyhound has not asserted that the legal standards governing the claim of Ms. Bates, who is white, are different than the standards governing Title VII claims of plaintiffs who are African American or members of any other protected class.

missing deposit thus would be inappropriate.[9]

The second possible level of generality would classify Ms. Bates as a Tallahassee customer service agent who had a missing deposit or other shortage of funds. There were many African Americans in this category, but Greyhound did not fire them; instead, the only employee in this category that Greyhound fired was Ms. Bates.

Greyhound asserts, however, that missing deposits and other shortages are different, so that an employee with a missing deposit is not "similarly situated" with an employee with another type of shortage.

The factual basis of Greyhound's position on this draws only scant support from this record. Nobody who had ever worked in the Tallahassee terminal or was familiar with the practices there drew any distinction between missing deposits and other shortages. So far as this record shows, nobody who had any involvement with Ms. Bates's firing drew any such distinction. And the written policy on which Greyhound relies, which makes a firing offense of "any mishandling or carelessness related to monies entrusted to" the care of an employee, makes no separate mention of, and apparently draws no distinction between, missing deposits or other shortages. On the face of the written policy,

the issue is whether the employee mishandled or was careless with funds, not whether the mishandling or carelessness manifested itself in a missing deposit or other shortage.

Still, a missing deposit and an ordinary shortage in balancing a day's work *are* different. Greyhound says it treats them differently, and Greyhound presented evidence that, as a matter of national policy, there is a difference in the discipline to be administered for missing deposits, on the one hand, and other shortages, on the other.[10] I assume for purposes of this order that, as Greyhound asserts, employees with missing deposits should *not* be deemed similarly situated with employees with other shortages.

The third possible level of generality would classify Ms. Bates as a Tallahassee customer service agent who had a missing deposit. This is a smaller category. This record includes evidence of only two or possibly three employees who had missing deposits: Ms. Bates, Barbara James, and possibly Sabrina Reed. (Tr. 151–52, 143.)[11] Ms. James and Ms. Reed are African American. (Tr. 100, 419.) Neither was fired. Thus Ms. Bates has established that she was treated less favorably than one or two similarly situated African

---

9. In an ordinary case, this articulation of "similarly situated" would be inappropriate for another reason as well. In determining whether an employee is "similarly situated" to others, the employee ordinarily should be regarded as *guilty* of whatever misconduct the employer determined had occurred. A Title VII plaintiff thus ordinarily cannot establish a prima facie case by asserting she is not in fact guilty of the offense for which she was disciplined. Here, however, Greyhound does not assert Ms. Bates in fact stole or otherwise mishandled the money; its assertion is simply that the deposit was missing when the safe was opened. *See* pages 1295–96, supra. It thus is that fact—that the deposit was missing—that must be taken as true for purposes of deciding whether other employees are "similarly situated"; it need not be assumed that Ms. Bates stole or otherwise mishandled the funds, because Greyhound made (and apparently still makes) no claim that she did.

10. This does not explain how an employee with a single missing $496 deposit is fired while participants in an elaborate $51,000 fraudulent scheme are not. But the circumstances of the $51,000 scheme—and the difficulty of proving who actually participated in that scheme—are themselves sufficiently different to cast substantial doubt on whether participants in that scheme should be deemed "similarly situated" to Ms. Bates.

11. Ms. Reed's incident involving more than $800 was referred to in a question as "the shortage, or the missing deposit that Ms. Reed had." (Tr. 143.) The terminal manager at the time, Ms. Smith, apparently attributed no significance to whether the incident was referred to as a "missing deposit" or other form of shortage, and at times during the trial the terms apparently were used somewhat interchangeably.

Americans. This is sufficient to satisfy this prong of the test for establishing a prima facie case.[12]

The fourth possible level of generality, the one advocated by Greyhound, would classify Ms. Bates as a Tallahassee customer service agent who had a missing deposit *while Xavier Collins was terminal manager.* Greyhound asserts Mr. Collins was free to adopt a different practice from earlier managers. And indeed he was. Had Mr. Collins testified that he made the decision to fire Ms. Bates based on his approach to management, or based on his view of appropriate discipline for this offense, or based on his understanding of the company's policies on proper discipline under such circumstances, or for any other reason good or bad, fair or unfair, then Mr. Collins's involvement presumably would distinguish Ms. Bates's circumstances from those of employees who had missing deposits under earlier managers. But Greyhound offered no such testimony. This record simply does not indicate that Mr. Collins made the decision or, if he did, what he based the decision on.[13] Nor does

the record indicate that there had been any other relevant change in corporate or district or Tallahassee policies or practices.[14]

In sum, Ms. Bates established a prima facie case of racial discrimination in connection with her firing.

## III. THE ABSENCE OF A LEGITIMATE NON–DISCRIMINATORY REASON FOR THE FIRING

Greyhound asserts that its policy is to fire any employee who has a missing deposit, that Ms. Bates had a missing deposit, and that she was therefore fired. Greyhound makes no claim that Ms. Bates stole the money or otherwise did anything wrong, but Greyhound asserts that, under Greyhound's policy, this does not matter; any employee with a missing deposit is fired, whether at fault or not.

 Such a policy would constitute a legitimate, nondiscriminatory reason for a firing that would be sufficient to carry a defendant's intermediate burden under the *McDonnell Douglas* analysis. The diffi-

---

**12.** Greyhound asserts in argument that Ms. Bates had two missing deposits, one in December 1995 and the one for which she was fired in May 1996. Greyhound presented no evidence, however, that the first missing deposit had anything to do with the firing. Indeed, Greyhound presented no evidence that anybody involved in the firing even knew about the December 1995 missing deposit. Absent evidence that Greyhound considered the December 1995 missing deposit in any way, that deposit is not grounds for narrowing the definition of "similarly situated" employees. *See, e.g., Lee v. Russell County Bd. of Educ.*, 684 F.2d 769, 775 (11th Cir.1982).

**13.** In its opening statement, Greyhound told the jury that the decision was made by Mr. Segal (the district manager who was Mr. Collins's boss and had been in that position at all relevant times, including when the other employees had missing deposits) and Mr. Collins together. (Tr. 86.) Other Tallahassee personnel matters, however, also had been reviewed by Mr. Briggs, the human resources senior manager in Dallas. (Tr. 136.) Mr. Briggs had vetoed Ms. Bates's promotion to lead agent, apparently out of concern for the reac-

tion of the terminal's African American employees, and had told then terminal manager Ms. Smith to "sit on" Ms. Bates in hopes she would quit. (Tr. 137.) It also was Mr. Briggs who told Ms. Smith the Tallahassee terminal needed a black manager and later replaced Ms. Smith with Mr. Collins, who is black. Mr. Segal was Greyhound's corporate representative at trial, but Greyhound did not offer his testimony on why Ms. Bates was fired or who made the decision. Greyhound's effort now to attribute the firing solely to Mr. Collins (and thus to distinguish Ms. Bates from Ms. James or Ms. Reed) simply is not supported by the record.

**14.** Greyhound notes that in April 1996—very shortly before Ms. Bates was fired—Greyhound revised its cash handling policy. (*Compare* Pl.Ex. 245a *with* Pl.Ex. 249.) As Greyhound's own corporate vice president testified, however, the changes had nothing to do with the proper discipline for an employee who missed a deposit. (Tr. 393.) Moreover, when Ms. Bates was fired, she was handed a copy of the out-of-date policy, thus apparently confirming that the newly issued revised policy had nothing to do with it. (Tr. 257.)

culty here, however, is that Greyhound presented no evidence that Ms. Bates was in fact fired on the basis of any such policy. The person or persons who made the decision did not testify on this, nor did anyone else who was familiar with the grounds of the decision. In the absence of evidence that the proffered explanation was in fact the basis of the decision, the employer's burden is not met. *See, e.g., Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 255 & n. 9, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (stating that, in order to meet its burden, "the defendant must clearly set forth, *through admissible evidence,* the reasons for" the action at issue; defendant cannot meet its burden through mere argument of counsel) (emphasis added); *Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 775 (11th Cir.1982) (holding that evidence that would justify plaintiff's discharge did not meet defendant's burden of providing a legitimate non-discriminatory reason for the discharge because nobody testified that the discharge was based on that evidence: "If there was no evidence that asserted reasons for discharge were actually relied on, the reasons are not sufficient to meet defendant's rebuttal burden") (citing earlier binding Fifth Circuit precedent).[15]

This result makes sense. Employment discrimination litigation is not a contest of imaginative attorneys. It is, instead, an effort to enforce the nation's laws against employment discrimination. A reason that a company or its lawyers conjures after-

the-fact says nothing about whether a decision was impermissibly based on racial discrimination.

If Mr. Collins or Mr. Segal or anyone else who was involved in the decision to fire Ms. Bates thought she should be fired for legitimate, non-discriminatory reasons—including any policy requiring any employee with a missing deposit to be fired whether or not the employee did anything wrong—it would have been a simple matter for Greyhound to present that testimony. Greyhound did not.

Similarly, if Mr. Collins or Mr. Segal or anyone else who was involved in the decision to fire Ms. Bates thought she stole the money or did something wrong and thus should be fired, or even if they thought she *might* have stolen the money or done something wrong and therefore should be fired, it would have been a simple matter for Greyhound to present that testimony. It did not.

If, however, Mr. Collins or Mr. Segal or Mr. Briggs thought Ms. Bates did nothing wrong but that, because she was white, it would create a problem among the predominantly African American Tallahassee workforce if she was not fired, and if they fired her for that reason, then there was no legitimate, non-discriminatory reason for her firing. An employer may not discriminate against an employee based on race in order to appease the real or imag-

---

**15.** *See also McDonald v. United Air Lines, Inc.,* 745 F.2d 1081, 1087 (7th Cir.1984) (stating that defendant's asserted legitimate non-discriminatory reason "must be based on admissible evidence and not merely ... argument of counsel"); *White v. Vathally,* 570 F.Supp. 1431 (D.Mass.1983) (Keeton, J.) ("The employer cannot rebut a prima facie case merely through ... argument of counsel" but must instead raise a "genuine issue of fact ... by introducing evidence setting forth the reason for" the action at issue), *aff'd,* 732 F.2d 1037 (1st Cir.1984); *Halfond v. Legal Aid Soc'y,* 70 F.Supp.2d 155, 163 (E.D.N.Y. 1998) (rejecting defendant's reliance on asserted reasons for adverse action in absence of evidence that those reasons were relied

upon by actual decision makers); *O'Halpin v. Nassau County Police Dep't,* 670 F.Supp. 75, 79 (E.D.N.Y.1987) (rejecting defendant's reliance on testimony of counsel who had no personal knowledge of facts regarding employment decision at issue; in absence of testimony by decision maker that proffered reason was actual reason for decision, defendant failed to carry its intermediate burden under *McDonnell Douglas* ). As these cases make clear, the employer need not carry the burden of persuasion on the issue of whether the asserted reason was the real reason for the decision at issue, but the employer must present evidence that, if believed, would support a finding the proffered reason was the real reason.

ined racial prejudices of a majority of other employees.

This record makes clear that the missing deposit precipitated the firing. The record does not address, however, how Greyhound went from the missing deposit to the firing. The record does not indicate who decided to fire Ms. Bates or why he or they made that decision. Absent evidence on these questions, Greyhound has not met its burden of presenting evidence that the decision was made for a legitimate, non-discriminatory reason.[16]

## IV. THE JURY'S FINDING OF DISCRIMINATION

■ In any event, even if Greyhound had proffered a legitimate, non-discriminatory reason for the firing, the jury's determination that the firing resulted from intentional racial discrimination would remain unassailable.

The record is clear that Ms. Bates was an excellent employee who did nothing wrong. She compiled and made her deposit to the safe in the appropriate manner, as witnessed by another employee. The safe was defective; there was every reason to believe it had been opened by someone else between the time Ms. Bates made her deposit and the time the Wells Fargo representative opened the safe the next morning. Other missing deposits and other shortages had not resulted in the firing of other employees. And on at least one occasion and probably more, higher ranking officials at the district or national level had explicitly made race a factor with respect to Tallahassee employment matters.

The jury determined that, but for her race, Ms. Bates would not have been fired. That was a reasonable determination on this record, well within the jury's province. Moreover, having presided over this trial and now having read and re-read this transcript, I am left with the firm conviction that the jury was correct. Had I been the finder of fact, I would have found that, in deciding what to do about this missing deposit, Greyhound (through whoever actually made the decision) considered Ms. Bates's race and the likely reaction of the predominantly African American Tallahassee workforce. I would have found that, had an African American employee's deposit come up missing on the morning of May 9, 1996, under exactly the same circumstances, the employee would not have been fired. I would have found, as this jury found, that but for her race, Ms. Bates would not have been fired.[17]

### CONCLUSION

For these reasons,

IT IS ORDERED:

16. To be sure, Ms. Bates testified that, when she was fired, Mr. Collins showed her the company's policy on mishandling or carelessness related to funds in an employee's care and said, "According to this, I have to terminate you." (Tr. 254.) Mr. Collins did not testify. There is no evidence that Mr. Collins in fact believed Greyhound had a policy of firing employees who had a missing deposit for reasons unrelated to any carelessness or mishandling of funds by the employee; no evidence that Mr. Collins believed Ms. Bates mishandled the funds or was careless; no evidence that Mr. Collins made the decision to fire Ms. Bates; and no evidence of why he made that decision, if he did.

17. Greyhound also asserts there was improper conduct by Ms. Bates's attorney at trial and other trial errors. I have reviewed these matters in detail, including the conduct by Ms. Bates's attorney, and conclude that they did not affect the outcome or render the trial unfair. This was not a perfect trial, but it was a fair trial, and it resulted in a reasonable verdict based on the evidence and applicable law. The amount of compensatory damages awarded by the jury a reasonable verdict based on the evidence and applicable law. The amount of compensatory damages awarded by the jury was well within the range of reasonableness. *See, e.g., Farley v. Nationwide Mut. Ins. Co.,* 197 F.3d 1322 (11th Cir. 1999) (upholding $300,000 compensatory damages award to wrongfully discharged employee).

Defendant's motion for judgment as a matter of law or for new trial (document 94) is DENIED.